THE STATE v. JOHN HAMBRIGHT.

*Homicide—Mortal Wound—Evidence—Excuse—Charge.*

1. In defence against an indictment for murder, it is no excuse to show that had proper caution and attention been given a recovery might have been effected.   Neglect or maltreatment will not excuse, except in cases of doubt as to the character of the wound.

2. But if the deceased, while languishing of a mortal wound, is killed by a second assailant, the first is not guilty of murder.

3. If the wound is mortal—sufficient to produce death—and death follows, it will be attributed to the wound, even though death was facilitated by some act of the deceased.

4. There being no evidence of any intervening cause of death, it was not error to refuse instructions upon it.

INDICTMENT for murder, tried before *Bynum, J.*, and a jury, at Spring Term, 1892, of CLEVELAND Superior Court.

The State proved that on the night of the sixth day of January, 1891, Jenks Macobson, colored, was shot in the right thigh with a load from a shot-gun in the yard of Laura Bridges, also colored, in the town of Shelby.   Shortly after the deceased was shot he was carried by colored men into the house of the said Laura Bridges, where he lay upon the floor until the arrival of a physician, about an hour after-

wards. He was given medical treatment, and, at his own request, about noon the next day, was carried from the house in which he had lain to the railroad train, where he was placed in the baggage-car and carried to Blacksburg, South Carolina, fifteen miles away. It was in evidence that about four hours after his arrival he was given medical attention, and died during the night of the 8th of January.

The State introduced Dr. D. S. Ramseur, who testified as follows: "I was called to see Jenks Macobson at Blacksburg the day after he was carried from here. He was suffering from a gun-shot wound in the thigh. I examined and treated him. He lived through the next day and died sometime during the next night. He died from the wound. I think it was a mortal wound. I probed around after his death and found some small mixed shot, and noticed one of the larger shot flattened. I took out of his thigh about a half-dozen shot and gave them to the Sheriff."

On cross-examination the witness testified: "I think that Macobson died from shock. There was no hemorrhage in Blacksburg, and I saw no evidence of any previously. I could not tell whether there had ever been any reaction from the primary shock. I mean by shock an injury to the vital parts reflected on the nerve centres, depressing the whole system and reducing the action of the heart. If a man suffering from a severe gun-shot wound were carried from a house to a train, transported fifteen miles in a baggage-car, and taken thence to a house some distance from the station, the transportation might have increased the shock."

In answer to the question whether such transportation would not necessarily have reduced the condition of a severely wounded patient, the witness said, "Yes; if the scales of life and death were evenly balanced, such transportation would have killed the patient. If the patient had bridged the shock, he might have died from gangrene or blood-poisoning; but he would not have died from direct

injury as a man dies who is shot through the heart or brain. I found no shot that had entered a vital part. The femoral artery was in the region of the wound, but, if it had been severed, the man would have died very soon after the wound. There was not time for gangrene or blood-poisoning. The man's pulse was weak. I did not think, until the second day I saw him, that he would die. The thigh-bone appeared shattered. I did not think the time opportune for a resection."

Dr. T. E. McBrayer, admitted to be an expert, was introduced by the State, and testified as follows: "I was called to see Jenks Macobson on the night of January 6. He was in the house of Laura Bridges lying on some old quilts, and suffering intense pain. I gave him spirits and injected morphine. I found him shot in the lower portion of the upper third of the thigh. About four inches of the bone seemed shattered and riddled with shot. I told him that there was no chance for him except amputation or resectioning. He said he did not want it done, but wanted to go to Blacksburg. I saw him next morning and found him cheerful. He said he had had a good night's rest. His pulse was better. His bladder would not act, appearing somewhat paralyzed from shock. I drew his water and sent him to Blacksburg. If an operation had been performed, the day after he was shot was the time to do it; I do not know that it could have been successfully done the night he was shot. His pulse and condition were better next day. A gun-shot wound like that would likely produce death. I cannot say certainly that the wound was mortal. I do not think the moving him necessarily produced death, though it would have had some effect. I cannot say that it was advisable to move him. It would have caused worry and weariness and made the shock worse."

The State introduced testimony tending to show that the defendant was the person who fired the shot at the deceased

on the 6th of January, 1892. Such evidence tended to show that the defendant did not take the gun for the purpose of assaulting the deceased, and did not know that the deceased was at the house of Laura Bridges until the defendant arrived there. The State also introduced confessions of the defendant, in which he admitted that he shot the deceased, but did not intend to kill him. The defendant offered no evidence.

Counsel for defendant asked his Honor to charge the jury as follows:

"1. If the defendant inflicted a wound upon Jenks Macobson that was not necessarily mortal, but Macobson's death was immediately caused by his being carried from Shelby to Blacksburg at his own request, the defendant is not guilty of murder, but of assault, with or without intent to murder, as the jury may find.

"2. If the defendant did inflict a mortal wound upon Jenks Macobson, but the immediate cause of Macobson's death was his transportation, at his own request, from Shelby to Blacksburg, the defendant is not guilty of murder, but of assault, with or without intent to kill, as the jury may find."

The Judge charged the jury as follows:

"1. Murder is where a person of sound mind and discretion unlawfully killeth any reasonable creature in being and under the peace of the State with malice aforethought, either expressed or implied.

"2. By sound mind and discretion is meant that the one doing the killing must have a will, a legal discretion.

"3. There must be an actual killing, not that death should be caused by direct violence. It is sufficient if the acts done endanger life and prove fatal.

"4. Malice is of two kinds, express and implied by law, and malice is a wicked intention to do an injury. Express malice is where a party evinces an intention to commit a crime. Implied malice is where a person commits an act unaccompanied with any circumstances justifying its com-

mission. The law presumes that he acted advisedly and intended the consequences produced by his act.

' 5. The defendant is presumed to be innocent until the contrary is proved beyond a reasonable doubt; so that your inquiry is, first, is Jenks Macobson dead? Second, if so, was his death produced by the unlawful act of the defendant?

" 6. Has the State satisfied you that Jenks Macobson is dead ? . For this the State relies upon the evidence of Dr. Ramseur.

" 7. Did defendant on night of January 6 shoot Macobson, as alleged, with powder and shot, wounding him in the thigh, and did that wound, so inflicted, cause the death of Macobson? If so, nothing else appearing, he would be guilty of murder.

" 8. Defendant denies the shooting. Has the State satisfied you, beyond a reasonable doubt, that he did do it? If it has not, it will be your duty to acquit. To establish this fact, the State relies upon some circumstantial evidence and some confessions, or rather statements, made by defendant.

" 9. Circumstantial evidence is inherently not as strong as direct or positive. Still, if it excludes from the mind of the jury every reasonable hypothesis consistent with innocence, it is your duty to be governed by it.

"10. Did the defendant that night go to the house of Bridges, where Macobson was, stand outside with a loaded gun, and when Macobson came out did he shoot him in the thigh, inflicting the wound as testified to by Dr. Ramseur and Dr. McBrayer, and from that wound did Macobson die? If so, the defendant is guilty of murder, and it will be your duty to convict.

"11. Has the State satisfied you that the deceased came to his death from a gun-shot wound at the hands of defendant? If so, the law presumes the malice and the defendant is guilty of murder. If Jenks Macobson did not die of the wound, but of something else, then the defendant is not guilty of

murder. In such case, you can find him guilty of secret assault or of assault with a deadly weapon. If the defendant secretly lay in wait for the deceased and shot him, but the deceased did not die of the wound, the defendant is guilty of secret assault. If the defendant fired at the deceased without malice, express or implied, and the deceased did not die of the wound, the defendant is guilty of a simple assault with a deadly weapon."

The jury was out about three hours, returned, saying they had not agreed, and asked for further instructions. His Honor charged the jury that "if the defendant lay in wait for the deceased and shot him and the deceased died of the wound, the defendant is guilty of murder. If the defendant simply fired at Jenks Macobson and Macobson did not die, defendant is guilty only of simple assault. If he died, the defendant is guilty of murder."

The defendant excepts to the fact that the Judge declined to charge the jury as requested by the defendant in his prayers for instructions, and also because, in the supplementary instructions to the jury, he failed to charge them specifically that if another cause than the wound intervened and produced the death of the deceased, the defendant would not be guilty of murder.

Verdict of guilty; motion for a new trial overruled, and appeal by defendant.

*The Attorney General,* for the State.
*Mr. George A. Frick* (by brief), for defendant.

BURWELL, J.: We have carefully considered the record in this case, with the assistance of the argument and br'ef of the prisoners's counsel, and find no error.

In Baker's case (1 Jones 267) it is decided that, when the wound is adequate and calculated to produce death, it will be no excuse to show that had proper caution and attention

been given, a recovery might have been effected. Neglect or maltreatment will not excuse, except in cases in which doubt exists as to the character of the wound.

In that case the testimony of the physician was that the wound was a mortal one, and that the deceased died from its effects. ."He could not say whether or not, under skilful treatment, he would have recovered ; worse cases are reported as having been cured by treatment." Hence it was not, according to the physician's statement in that case, a wound *necessarily* mortal, but one " calculated and adequate to produce death," and in that sense a mortal wound, of which the deceased died.

The testimony in the case before us is that the wound inflicted on the deceased by the prisoner, as the jury have found, was " calculated and adequate to produce death.", One physician (Dr. D. S. Ramseur) testified that it was a mortal wound, and that deceased died of it. The other physician stated that when he first saw the deceased, soon after the wounding, he told him " that there was no chance for him except amputation or resectioning." He further stated that " a gun-shot wound like that would likely produce death," and added that he could not say certainly that the wound was mortal.

It appears, therefore, that all the testimony on the trial was to the effect that the wound of the deceased was "adequate and calculated to produce death."

The theory of the defence was that the death of the deceased was caused immediately by his being carried to Blacksburg while suffering from the shock of the wound ; and it was insisted that if this removal to Blacksburg, which was the voluntary act of the deceased, so aggravated the effect of the wound as to cause it to produce death, while if no such removal had occurred, and proper treatment had been bestowed, he would have recovered, this defendant would not be guilty, for the law would attribute the death,

as it was contended, not to the remote act of the defendant, but to that which was the more immediate cause, to-wit, his voluntary exposure of himself to fatigue and worry while still under the first effects of the wound.

It is true that if one man inflicts a mortal wound, of which the victim is languishing, and then a second kills the deceased by an independent act, the first cannot be said to have killed. *State* v. *Scates,* 5 Jones, 420 cited by defendant's counsel.

It is also true, that if injuries are inflicted on a person which are not sufficient of themselves to cause death, and the injured person voluntarily, and of his own accord, so exposes himself as to produce death, the one who inflicted the injuries is not guilty of the killing, even if the infliction of the injuries was the motive for the voluntary exposure. *State* v. *Preslar,* 3 Jones, 421, cited by defendant's counsel. But it is not true that if a wound be inflicted which is "adequate and calculated to produce death," and death ensues as the result of the wound, the person who inflicted the wound can exonerate himself by showing that some conduct of the wounded man, or his attendants, lessened the chances of his surviving his injuries, and thus caused the death. Baker's case, *supra.*

Hence, if it be conceded that the removal of the deceased from Shelby to Blacksburg, at his own request (a harmless act in itself), caused the wound—a dangerous one—to produce death, the dying is by the law attributed to the wound, and the guilt is imputed to him who inflicted it.

His Honor, therefore, properly refused the instructions asked for by defendant's counsel. There was no evidence of any intervening cause to which the death could be attributed under the rules of law as laid down in Baker's case, *supra.*

The charge given to the jury by his Honor was not excepted to. It was certainly a fair exposition of the law applicable to the facts of the case.

The exception of the defendant that his Honor failed "in the supplementary instructions" to charge the jury "that if another cause than the wound intervened and produced the death of the deceased, the defendant would not be guilty of murder," is untenable, for the reason that, as above stated, there was no evidence of any intervening agency which the law would recognize as the cause of the death.

No Error.                                          Affirmed.