STATE v. DRAYTON MEDLIN.

(Decided June 14, 1900.)

*Indictment—Murder—Assailant with Deadly Weapon and Deadly Intent—How Remitted to Right of Self-Defense.*

While the assailant remains in the conflict, to whatever extremity he may be reduced, he can not be excused for taking the life of his antagonist to save his own. In such case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct. But when he has succeeded in wholly withdrawing himself from the contest, and that so palpably as, at the same time, to manifest his own good faith, and to remove any just apprehension from his adversary, he is again remitted to his right of self-defense, and may make it effectual by opposing force to force, and when all other means have failed, may legally act upon the instinct of self-preservation, and save his own life by sacrificing the life of one who persists in endangering it.

INDICTMENT for the murder of William Brown, tried before *McNeill, J.,* at Fall Term, 1899, of GASTON Superior Court.

The deceased was floor manager in a cotton factory at Gaston, N. C.; the prisoner and his little daughter were employees there. On the evening before the homicide the prisoner and deceased had a quarrel over the number of days the girl had been employed, and opprobrious epithets were interchanged. The next day the prisoner armed himself with a pistol and went to the factory—they exchanged shots at sight, the prisoner shooting first and repeating the fire, and killing Brown.

There was no exception to the evidence or the Judge's charge as given. The only exception was to the refusal of his Honor to give a special instruction prayed for by the

prisoner. There was a verdict of guilty of murder in the first degree, followed by judgment of death. The prisoner appealed. The special instruction appears in the opinion, and so does a full detail of the circumstances of the case.

*Messrs. Osborne, Maxwell & Keerans,* for appellant.
*Messrs. Jones & Tillett,* and *Brown Shepherd,* with the *Attorney-General,* for State.

DOUGLAS, J.  This is an appeal on a conviction of murder in the first degree. There is but one exception, which is to the refusal of the Court to give the following instruction: "If the jury find from the evidence that the prisoner wilfully, deliberately and with premeditation, shot at the deceased with the intent to take his life, and the deceased shot at the prisoner in the tower in self-defense, and the prisoner after having made the first assault, as above set forth, turned and fled from the deceased down the steps out of the tower, closing the door after him to prevent the deceased from shooting him, and further retreating from the tower some fifteen or twenty steps with the intent of wholly withdrawing from the conflict in good faith, and with no design to continue it, and the deceased knew that all danger from the prisoner had passed, and the deceased went to the window and shot at the prisoner, still holding his pistol drawn on the prisoner, and the prisoner turned and shot the deceased, killing him, such killing would be in self-defense, and excusable under the law, and the verdict should be not guilty, provided at the time of firing the fatal shot he reasonably apprehended his own life was in imminent peril, and that further retreat would be fatal to him."

We have given this case most careful consideration, as we try to do in all cases, and as we always do in those involving

the life of a fellow-being. Whatever doubts we have are resolved in favor of the prisoner whose life is in our hands unless, upon mature reflection, it clearly appears that those doubts are purely the result of human sympathy, unsupported either by reason or precedent. In such cases we can not permit personal feelings to interfere with the proper execution of the law whose ultimate objection in punishing the guilty is the protection of the innocent. In cases of murder, in our sympathy for the accused we can not entirely forget the victim or the living who may become the victims of unpunished crime. We do not think that the prisoner was entitled to the instruction asked under all the circumstances of his case. It is drawn with great skill and care, and appears to be correct as an abstract proposition of law; but it assumes, in favor of the prisoner, facts and evidence that do not appear to us. In the first place, it assumes, or might well have been understood by the jury as assuming, that the deceased was killed by the last shot fired by the prisoner. This entirely excludes the possible effect of the previous shots, which the jury might have believed from the evidence caused the death of the deceased. Therefore, even if the remainder of the prayer had been proper as to the last shot being fired in self-defense, it was not proper to say that, therefore, "the verdict should be not guilty," without some further qualification. It seems to us that even if the last shot had been admittedly fired in self-defense and had inflicted a mortal wound, the prisoner would still have been guilty if any of his previous shots had mortally wounded the deceased. Those shots were, by the very terms of the prayer, admittedly fired without excuse or palliation, and if either of them had produced a mortal wound the prisoner would have been guilty of a crime that would have ripened into murder upon the death of the deceased if they had ultimately contributed to his

death.   This rule would be different if it were shown that the last shot was the exclusive cause of death, or by itself the proximate and immediate cause.   *State v. Scates,* 50 N. C., 420; *State v. Hambright,* 111 N. C., 707.   But of this we find no evidence and certainly none that would justify the Court in assuming it as a fact.   It is well settled in this State that the killing with a deadly weapon implies malice, and that where it is admitted or proved beyond a reasonable doubt the prisoner is presumed to be guilty of murder at least in the second degree, and the burden then rests upon him of proving such facts as he relies on in mitigation or excuse. *State v. Byrd,* 121 N. C., 684; *State v. Booker,* 123 N. C., 713.

Aside from this, we do not think that the evidence justified the prayer.   We see no evidence tending to show that "the deceased knew that all danger from the prisoner had passed," nor can we find, either in the citations furnished to us by the learned counsel for the prisoner, or in our own investigations, a single precedent holding that the prisoner, under circumstances similar to those of the case at bar, had so far "withdrawn from the conflict" as to relegate him to his right of self-defense.   The counsel cited us to *State v. Hill,* 20 N. C., 491; *State v. Ingold,* 49 N. C., 216; *State v. Brittain,* 89 N. C., 481, 500; *State v. Hensley,* 94 N. C., 1021, 1036; *State v. Wilcox,* 118 N. C., 1131; 1 Hale P. C., 479, 480; Wharton Law of Homicide, 213; Kerr on Homicide, 201, 202; 1 Bishop Cr. Law, secs. 870, 871; Horrigan & Thompson Self-Defense, 213, and notes; *Stoffer v. State,* 15 Ohio St., 47.   None of these authorities appear to sustain his position.   Some of them relate to *chance medley* where the party attacked had never lost his right of self-defense; but in *all* cases where the prisoner pleaded *se defendendo* he was required to show that he had "retreated to the wall."   Hale

STATE *v.* MEDLIN.

says (omitting the citations): "But now suppose that A by malice makes a sudden assault upon B who strikes again, and pursuing hard upon A, A retreats to the wall, and in saving his own life kills B, some have held this to be murder, and not *se defendendo* because A gave the first assault.     *     *     * It seems to me that if A did retreat to the wall upon a real intent to save his life, and then merely in his own defense killed B, that it is *se defendendo*.     *     *     *     But if on the other side A, knowing his advantage of strength, or skill, or weapon, retreated to the wall merely as a design to protect himself under the shelter of the law, as in his own defense, but really intending the killing of B, then it is murder or manslaughter as the circumstances of the case require. *     *     *     Regularly it is necessary that the person that kills another in his own defense fly as far as he may to avoid the violence of the assault before he turn upon his assailant." East and Hawkins both think it would be murder, but Sir Michael Foster appears to agree with Sir Matthew Hale. Wharton says on page 213: "In cases of personal conflict in order to prove this defense, it must appear that the party killing had retreated, either as far as he could, by reason of some wall, ditch or other impediment, or as far as the fierceness of the assault would permit him." Bishop says in sec. 869: "But he (referring to Lord Hale) goes on to explain, and so do the other old writers, that the assailant's life can be taken only when no other means of escape are open. Such likewise is our own modern law." Kerr says in sec. 179: "In those cases where the assailant by his own conduct had, before the homicide was committed, given notice of his desire to withdraw from the combat, and had really and in good faith endeavored to decline any further struggle, and the homicide was necessary to save himself from great bodily harm, it might be excusable." And again at the head of sec.

180:   "The killing must appear to be the last resort for safety." The same author in sec. 181, says: "The weight of authority now is that when a person, being *without fault* in a place where he has a right to be, is violently assaulted, he may without retreating repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." Clearly this section does not apply where the assailant is the slayer, as in the case at bar. Clark on Criminal Law, on page 155, says: "Self-defense is no excuse for a homicide if the accused brought on the difficulty and was himself the aggressor. If, however, after bringing on the difficulty a person in good faith withdraws, and shows his adversary that he does not desire to continue the conflict, and his adversary pursues him, he has the same right to defend himself as if he had not originally provoked the difficulty, but the withdrawal must be in good faith. If he withdraws, and gives his adversary reasonable ground for believing that he has withdrawn, it is sufficient.    *    *    *
It follows, from what has already been said, that where the original aggressor ceases the attack and shows that he has abandoned it, and the person assailed renews the difficulty, he becomes in turn the aggressor and can not plead self-defense if he kills the original aggressor to save his life." The matter is very clearly treated in McClain on Criminal Law, in secs. 308, 309, 310. In the last section the author says: "As appears from the preceding section, one who voluntarily enters into a combat or is the original aggressor, can not excuse a subsequent homicide committed in consequence thereof on the ground of self-defense, it being his duty to withdraw; but there must be allowed room for repentance and abandonment of the evil and unlawful purpose, and if the defendant, though originally in the wrong, does thus abandon his purpose, he may afterwards exercise the right of self-defense. The with-

drawal, however, must be in good faith; * * * and the fact of change of purpose must be known to the other party (citing *State v. Edwards,* 112 N. C., 901). Perhaps this duty to withdraw does not exist where the danger has become such that a reasonably prudent man would consider that withdrawal would imperil his life. But a distinction must be introduced between the duty to *withdraw* here referred to and the duty to *retreat* discussed in the next section, for in the cases now under consideration the party who seeks to avail himself of the right of self-defense has been originally in the wrong, and it is doubtful whether he ought to be excused for killing in self-defense before a definite withdrawal, no matter how dangerous such withdrawal might be."

Perhaps the best expression of the rule we have found applicable to the case at bar is in *Stoffer v. State,* 15 Ohio St. Rep., 47, justly considered a leading case, in which the subject is learnedly and reflectively considered. The Court says, on page 53: "While he (the assailant) remains in the conflict, to whatever extremity he may be reduced, he can not be excused for taking the life of his antagonist to save his own. In such case it may be rightfully and truthfully said that he brought the necessity upon himself by his own criminal conduct. But when he has succeeded in wholly withdrawing himself from the contest, and that so *palpably as, at the same time, to manifest his own good faith and to remove any just apprehension from his adversary,* he is again remitted to his right of self-defense, and may make it effectual by opposing force to force, and, when all other means have failed, may legally act upon the instinct of self-preservation, and save his own life by sacrificing the life of one who persists in endangering it."

Can the case at bar in any aspect be brought within this rule? Let us take the prisoner's own testimony, which is

contradicted by other witnesses, but which we will assume to be true for the purposes of the argument. He testifies that he had a dispute with the deceased about the time and pay of his daughter. Next morning he put his pistol in his pocket and again went to see the deceased. They had another dispute, in which both he and the deceased cursed each other and bandied opprobrious epithets. He then went home, and soon after returned to the office of the deceased. The following are his own words as they appear in the record:

"I went on to the mill with my little girl behind me. When I got to the tower door Mr. Sherrill was standing in the door with his back against the south door facing, with his face towards me. He says to me 'Mr. Medlin if I was you I wouldn't have any fuss with Brown.' I said 'Oh hell, I didn't come here to have any fuss.' I walked into the door and turned to the right and stepped on a platform about one step high, and then I stepped two or three steps up the steps. When I got up two or three steps I could see Mr. Brown getting up out of a chair. I could not see the chair. He was raising up when I first saw him, looking right at me. I stepped one step after I saw him and Brown was getting up with both hands in his pockets, and when he got up I saw that he was drawing his pistol out of his right pants pocket. I saw the white metal piece on the butt of the pistol between his fingers. When I saw that I stepped one step down and reached for my pistol, and says to Brown, 'Don't.' Then I jerked my pistol out as quick as I could get it out. When I jerked it out of my pocket I nearly let it fall out of my hand, and I grabbed it with both hands. I throwed it up with both hands in front of my body. By that time Brown was coming over with his pistol, and throwing it right down in my face. I shot then. I saw that he was going to shoot, and I shot, and then Brown shot. I kept going backwards down the

steps.   I saw that Brown was making an effort to shoot again, and I shot again as quick as I could.    When I shot the second time I was near the bottom of the steps—I think on the platform.    I wheeled.    As I turned round to run out the door somebody shot at me.    I don't know who it was.    I ran out the door and jerked the door shut behind me.    When I got on the outside I thought of my daughter, and turned round to find her.    She jerked the door open behind me, and jumped out of the door, and hallooed 'Lord have mercy, what is the matter, pa?'  While I was standing there I heard somebody coming down the steps—running.  I looked inside the door, and Mr. Brown by that time had got to the last step, stepping on to the platform and turned to come in the door.    Just as he came in front of the door I told him to stop, and he didn't stop, but was raising his pistol to shoot again, and I shot at him.    When I shot he jumped back and slammed the door to.    My little girl was down about the corner of the tower then.    I said to her 'get out of the way,' and started for home. She followed me.    I was going in a sort of a run.    When I got 20 or 25 steps from the tower I heard somebody say 'Yonder he goes, shoot him.'    I turned my head, and just as I turned my head somebody shot at me again.    As I turned round I saw George Ballard leaning out of the window up stairs.    While I was looking I dropped my eyes, and saw Mr. Brown standing in the window down stairs with his pistol in both hands.    The smoke was boiling out of the window as if he had just shot.    I threw my pistol back and shot at Brown, and ran on.    I looked back again but did not see Brown any more.    As I shot the last shot I saw him throw his hand on his left breast and stagger back.    That's the last I saw of Brown."

It thus appears from the prisoner's own testimony that he took no chances, but anticipated every action of the deceased.

He went around to the office of the deceased, Brown, with whom he had recently quarreled. He drew his pistol because Brown looked as if he intended to draw his pistol. He fired because Brown looked as if he was going to fire. As he was going down the steps backwards he shot again because Brown looked as if he was making an effort to shoot. After getting out of the factory he turned around and shot again because Brown would not stop when he told him to stop. After getting 20 or 25 steps from the factory (but how far from the place where he fired the last shot, is not stated) he turned again because he heard someone say: "Yonder he goes, shoot him." After he turned his head around somebody shot at him, and then he again shot at Brown. We rarely find a more perfect specimen of Parthian tactics. Two things here are worthy of note: he turned around *before* the shot was fired, and he does not say that it was fired by Brown. He says Brown was "standing in the window with his pistol in both hands," and that "the smoke was boiling out of the window as if he had just shot." It is common knowledge that if Brown had shot in such a position the smoke from his pistol would have been carried out of the window with the discharge. The prisoner certainly had not "succeeded in wholly withdrawing himself from the contest," if indeed he had made any effort to do so, as he was constantly turning and shooting as he retreated. We are at a loss for any evidence whatever that he had done anything to "remove any just apprehension from his adversary." The last word he addressed to him but a few seconds before was a peremptory order to stop, followed by a pistol shot. He is not certain that Brown himself fired but one shot at him, while he admits he fired four shots at Brown. None of the shots hit him or came anywhere near him, as far as we can see. If he was in any danger when the last shot was fired at him, he would have

been in less danger if he had kept on running instead of stopping and turning around to await and return the shot. He had not retreated to the wall, or a ditch, or anything that could stop him, and if he had continued running he would soon have been out of any effective range of the ordinary pistol. In any event a man in the open would be safer running than stopping and exchanging shots with a man in a building, who by stepping aside could have fired out of the window with perfect aim and but little exposure of his own person. We must remember that the prayer itself is based upon the assumption that the prisoner had been the aggressor, and therefore the duty rested upon him not simply of *retreating* but of *wholly withdrawing* from the contest as far as possible before he could resume his right of self-defense, of which he had voluntarily divested himself by his original assault.

Of all the cases cited by the defendant that of Ingold goes farthest in his direction, but even that falls far short of sustaining his contention. In that case this Court says: "There is manifest error in the first proposition of law laid down by his Honor. 'If the prisoner willingly entered into the fight, and during its progress, *however sorely he might be pressed,* stabbed the deceased as described by the witnesses, his offense, at least, would be manslaughter? By *sorely pressed* we understand being *put to the wall,* or placed in a situation where he must be killed or suffer great bodily harm, or take the life of his adversary. Supposing there was evidence to raise this point, the offense according to all the authorities, was excusable homicide, which Foster calls self-defense culpable, but through the benignity of the law, *ex-cusable* (citing Foster's C. L., 273-4); 1 East Cr. L., 279; 4 Bl. Com., 184; 1 Hale, 482). Indeed, as the deceased made the first assault with a deadly weapon, i. e., 'a stone about the size of a goose egg'—thrown with violence, at a

short distance, and following it up by pushing the prisoner against the jam of the fence, gave him two blows, and then caught him with his hand about the mouth, having him against the fence, bent over on the side, before the prisoner struck him at all, if the necessity for killing existed, which his Honor assumed, it would seem to have been rather a case of justifiable homicide." This short statement shows the utter dissimilarity of that case from the one at bar. In that case occurs the following sentence, illustrating amongst others not only the profound legal knowledge of the great Chief Justice, but also his intimate acquaintance with the mainsprings of human action. He says, on page 222: "It is true, while they were *holding him* in the piazza, he flourished his knife, and swore 'one of us has to die before sunset;' but everyone who has witnessed scenes of this kind, knows that such 'rearing and charging and popping of fists' are far from evincing a deliberate purpose, particularly when the opponent is a much stouter and more able-bodied man. The barking of a dog shows that he thinks it safer to bark than to bite."

This illustration was very apt where used, but scarcely applies to the case at bar. The popping of a pistol, especially when aimed with a deadly intent, means far more than the popping of fists; and the barking of a Colt's revolver has a compass beyond the gamut of a barking dog. We regret to say that we see no evidence beyond a scintilla that the prisoner had in good faith wholly withdrawn from the contest before he fired his last shot, and certainly none that "the deceased knew that all danger from the prisoner had passed." The record says that there was "evidence tending to show that the prisoner armed himself with a pistol and returned to the tower for the purpose of shooting the deceased, drew his pistol as he went up the steps leading to the second story of

the tower where he had left Brown, took aim at him with his pistol, fired once at him while deceased was sitting in his chair; that Brown returned the fire; prisoner fired again and inflicted a mortal wound upon him. After firing the second shot the prisoner turned and fled down the steps, Brown pursued him to the ground floor of the tower. Prisoner got out of the tower and Brown, the deceased, went to the window on the lower floor, fell and died from the wound inflicted as above stated." The record further says that, "The prisoner introduced evidence tending to show that the shooting, occurring in the upper story of the tower, was done in self-defense. Upon this evidence his Honor charged the jury as requested by the prisoner." As the prisoner appears to have had a fair trial, so much so that he has complained of nothing except the single exception already considered, to which he was not entitled, we are constrained to affirm the judgment of the Court below.

Affirmed.