STATE v. EMMA SIMPSON.

(Filed 26 June, 1956.)

1. **Criminal Law §§ 52, 91—**

On motion to nonsuit, the evidence must be considered in the light most favorable to the State, and contradictions and discrepancies in testimony of the State's witnesses are for the jury to resolve.

2. **Criminal Law § 31d—**

The assumption in a hypothetical question of the existence of a vital fact not supported by evidence, is ground for a new trial.

3. **Homicide § 25—Circumstantial evidence held insufficient to be submitted to the jury in this prosecution for murder.**

The evidence tended to show that deceased had two bullet wounds in his body, that at least two or three minutes elapsed between the time the first and second shots were fired, and that a person other than defendant fired the first shot. The circumstantial evidence was sufficient to be submitted to the jury as to whether defendant had the pistol when the second shot was fired and also that the second shot penetrated the right side of the victim's chest, but there was no evidence as to when the deceased fell or when he died, or which of the two wounds caused death, and the evidence excluded any assumption that defendant and the person who fired the first shot acted in concert. *Held:* Nonsuit should have been allowed for want of any substantial evidence that the shot fired by defendant caused or contributed to the death, whether the deceased was dead when the pistol was fired the second time being left in the realm of conjecture.

4. **Homicide § 16—**

In a prosecution for homicide arising out of a shooting, the State must prove that the shot fired by defendant was a proximate cause or a concurring or an accelerating cause of the deceased's death.

APPEAL by defendant from *Carr, J.,* April Term, 1956, ROBESON.

Criminal prosecution based on indictment charging Northrup McNair and Emma Simpson with the first degree murder of Danzy Simpson, wherein the State asked for no greater verdict than guilty of murder in the second degree.

At their trial at April Term, 1955, McNair was represented by counsel. Defendant had no counsel. At the close of the State's evidence, upon motion of his counsel, the case was nonsuited as to McNair. The court, this defendant being without counsel, entered in her behalf a motion for judgment of nonsuit. The motion was overruled. Thereupon, defendant testified in substance that McNair shot and killed her husband. The State then used McNair as its witness against defendant. No motion for judgment of nonsuit was entered in this defendant's behalf at the close of all the evidence. As to this defendant, there was a verdict of guilty of murder in the second degree. From the judgment pronounced, she appealed to this Court. A new trial was awarded for the reasons stated in *S. v. Simpson*, 243 N.C. 436, 90 S.E. 2d 708. Whether, as to her, judgment of nonsuit should have been entered at the close of all the evidence, was not considered. No motion therefor had been made.

At her second trial, this defendant was represented by counsel. She did not testify. The evidence consisted solely of that offered by the State. Summarized, it is set out below.

Danzy Simpson, the deceased, and his wife, Emma Simpson, the defendant, lived near St. Pauls in a house of at least two rooms, referred to as the front room and the back room or kitchen. A "homemade" door was between the two rooms. Swindell Black and Aleen Black, his wife, and their 4-year-old son, were then living with the Simpsons. They had been there about three weeks. Aleen Black is McNair's sister.

At an undisclosed hour on Friday, 18 February, 1955, Danzy came home from his work. He wanted to stay home and take a bath. Emma, Swindell and Aleen wanted to go to Tink Ray's place, a piccolo joint, on the other side of town. They left Danzy at home, with the 4-year-old boy, and walked the mile and a half to Tink Ray's place. Nothing had occurred at the Simpson home to indicate friction or ill feeling.

They met McNair and Dell Lewis, whom they knew, at Tink Ray's place. Nothing of significance occurred there, so far as the evidence discloses, unless it be McNair's admission that he then had with him his loaded pistol, concealed in his hip pocket. Dell agreed to take them home in his car. They left shortly after 10:00 p.m. Dell drove first to the house of McKinnon, his cousin, where all got out and stayed awhile. Nothing of significance occurred at McKinnon's house, so far as the evidence discloses. Upon leaving McKinnon's house, near midnight, Dell drove up to and beyond the Simpson house and stopped. Swindell and Aleen had been riding in the back seat. Dell was driving, Emma was to his right, McNair was to her right, these three on the front seat. McNair got out and made way for Emma to get out. The house was

dark. Danzy and the 4-year-old boy were in bed together. It is noted that all of these persons, except McNair, originally a codefendant, are usually referred to herein by their given names.

Dell, McNair·and Swindell testified for the State. As to the facts stated above, there is no material conflict in their testimony. As to what occurred thereafter, there are contradictions and discrepancies.

. 1. *Entry into the Simpson house.* Swindell's version: Emma went to the door and called Danzy. He did not answer. The front door was fastened on the inside with a crosspiece latch. Emma went to the wood-pile. There she got an axe and came back and struck the front door and knocked it open. She went into the house, carrying the axe with her. McNair's version: Emma went straight to the woodpile and got the axe, omitting any reference to her going first to the front door and calling Danzy. Dell's version: He saw no axe then. Emma went straight to the back of the house, went in the back door, then came through the house and opened the front door from the inside.

2. *Emma's quarrel with Danzy.* Emma turned on the ceiling light in the front room. She called to those at the car to come in. They did so. Meanwhile, Emma had gone to the bed in which Danzy and the boy were lying. The cover was up to Danzy's waist. He was wearing long-handle underwear, nothing else. Swindell's version: Emma was upbraiding Danzy· for not opening the door, he protesting that he had been asleep; also, she was saying *something* to him about money. Dell's version: Emma was saying that Danzy had some money she hadn't got and had to have. McNair's version was in accord with that of Dell, with the addition that Emma was "cussing" him for a "Damn s.o.b." All agree that she was on top of Danzy, beating him in the face with her fists; that they tussled on the bed, he trying to get her off of him; and that, finally, she got off or he pushed her off. She then went into the kitchen, closing the door between the two rooms. Meanwhile, Danzy, clothed as stated, had gotten up and was standing in the front room near the kitchen door.

3. *The barrage from the kitchen.* From the kitchen, Emma struck the door with an axe, the blade going through the door. Danzy grabbed the protruding axhead and jerked the axe through the split in the door. Thereafter, all agree, Emma, from the kitchen, threw glass jars, plates, cups, etc., into the front room, and while this was in progress the one light, in the ceiling of the front room, went out. Swindell's version: Emma told everybody to leave before she went into the kitchen; also, the first jar thrown by her knocked out the burning light bulb. Dell's version: Emma, upon opening the kitchen door and just before the bar-rage of dishes, etc., the light in the front room being on, screamed: "All of you s.o.b.'s get out"; also, shortly thereafter the light went out. Mc-

Nair's version: Emma threw dishes, etc., for two or three minutes before the light went out; also, when the light went out, Emma said: "All of you s.o.b.'s get out of here."

4. *The first shot.* Dell's version: When the light went off, he went straightway to the front door, some 6½ to 7 feet from where he had been. No one else was there. He heard a pistol fire as he was putting his foot on the outside step. Shortly after Emma and Danzy had started fussing, McNair was standing there in the front room, with his pistol in his hand. Nobody had done anything to him. Swindell's version: When the pistol fired, he was on his way from the front room into the kitchen to get a new light bulb. McNair's version: He got his pistol out when Emma *and* Danzy told him to get out and hit him; this was about 15 minutes after he got there; he was about "middleway" the room; he started to leave; he was about two feet from the front door when Emma *and* Danzy assaulted him, Emma then having an axe and Danzy a chair; he was hit on the head by the chair and the axe came down on the chair, knocking him down, addling him. When he was so hit the pistol fired, while in his hand, without any intention on his part to fire it; it fired once while in his possession; he got up, this taking about a minute, and left; he didn't see Dell or Dell's car; the pistol fired only once while he was there; he walked to his home, about a mile; he first missed his pistol when he got home; he had left the Simpson house before the light came back on. He testified: "When I left the house, Danzy was standing near the bed."

5. *The second shot.* Dell and McNair both testified that they heard only one shot. Dell left the premises before McNair. Dell's version: Leaving the house, he went directly to his car. The windows were up. In starting his car, it "made a noise like a car ordinarily does." He backed it around, causing his car lights to shine against the front door. It was open. Emma was standing in the door. McNair, standing on the ground or on the step, was facing her. His hands were braced against the doorframe. He could see only the back of McNair's hands. He saw no pistol, heard no conversation. In this condition of affairs, he drove away. Only Swindell's testimony bears expressly on the second shot. Swindell's version: He was on his way back from the kitchen to the front room when the pistol fired a second time; two or three minutes elapsed between the two shots; after the light went off, Emma came into the front room, but he did not hear her say anything; his testimony is silent as to what occurred, if anything, between Emma and Danzy, on the one hand, and McNair on the other; McNair was standing in the door when he last saw him before the light went out; after the second shot, he managed to remove the broken light bulb and insert the new one, so that again there was light in the front room.

6. *Danzy's death revealed.* The scene, when the light came on, is described by Swindell. Dell and McNair were not there. The little boy was in bed. Aleen, Swindell's wife, was on "the long chair in there; she was asleep; she was drunk to start with. She was asleep when it happened. She was still asleep when the lights went out." The front door was open. It opened inward. Emma was coming from behind this door; she had the pistol in her hand, wrapping it in a grey (identified) shirt. She was from five to eight feet from Danzy. He was lying on the floor, dead. He was spread out, "with his feet right up 'side of the door"—his feet near the front door. Danzy then had on a brown (identified) shirt and a pair of overalls. One suspender of the overalls was on, the other loose. Not over two buttons of the shirt were fastened.

7. *Investigation by officers.* About 2:00 a.m. Saturday, 19 February, 1955, Deputy Sheriff Hendrix, a State's witness, and two others, started an investigation. The record does not disclose who sent for them. They "met" Emma and Swindell, who were standing in a neighbor's yard some 300 yards from the Simpson home. ·When they drove up, Emma started towards the car. She handed to Hendrix the (identified) "grey looking piece of a shirt." (Hendrix testified: "Emma stated Northrup shot her husband and there was the gun." Since the witness had not been asked what, if anything, Emma said, the court properly instructed the jury to disregard Emma's statement.) Hendrix opened partly the piece of shirt and found the .22 pistol, the death weapon. Later, upon close examination of the pistol, he found two empty (fired) cartridges, with odor of freshly burned powder. Going to the Simpson house, he found the light on in the front room. Broken dishes and like debris were scattered over the floor. Danzy's position on the floor was substantially as described by Swindell, his feet being approximately two feet inside the front door. Danzy had on a pair of overalls, the. bib not fastened; the brown (identified) shirt, the second button from the bottom being the only one fastened; underneath the shirt he had ·on white, long, winter underwear. Under the central portion of Danzy's body was the latch off of the front door, "a piece of tobacco stick about 12 inches long with a nail in the center." Approximately half way from his belt to his shoulders he found an axe, the handle being under his left shoulder. As to wounds: There was a small spot of blood and a hole in his underwear; when he pulled the underwear back he saw, opposite the hole, a bullet wound, with blood around it, about three inches from the point of his shoulder and approximately an inch to an inch and a half down from the top of his shoulder; there was no corresponding hole in the brown shirt; about three inches below his right armpit on the right side of Danzy's chest, he discovered another bullet wound, with blood around it; opposite this wound there was a bullet

hole both in the underwear and in the brown shirt; there were powder burns around this hole. *With a pencil,* he probed the two wounds. Inserting the pencil in the shoulder wound, it went straight in, approximately an inch and a half and then struck bone. *He could not tell where the bullet lodged.* Then, probing the chest wound, "the pencil went straight into the body from the outside, turned into the inside of the chest wall, went between two ribs, . . . indicating that the bullet had pierced the inner wall of the chest." *He could not tell where the bullet lodged.* Both bullets lodged somewhere in Danzy's body.

8. *Miscellaneous.* (1) Swindell testified that he had been drinking. He testified that Emma had not been drinking, so far as he knew. Except as to Aleen, Swindell and Emma, no inquiry was made as to whether the others had been drinking or were drunk. (2) As its final evidence, the State recalled Swindell. He *then* testified that the next morning (Saturday) he had a conversation with Emma in which Emma said: ". . . if I tell anything on her or talk, she would get me later; if I tell anything about what happened. She did not tell me how she would get me, nor what she would get me with."

9. *Cause of death.* The State offered Dr. D. E. Ward, a medical expert. He had not at any time seen Danzy's body. His testimony on direct examination relates solely to a hypothetical question and his answer, to wit, "Q. . . . Doctor, if this jury should find from the evidence and beyond a reasonable doubt that on or about February 19, 1955, Danzy Simpson, male person, apparently in good health, was shot with a .22-caliber pistol, that the bullet entered his right side at a point some few inches immediately below the center of his armpit and ranged straight into his chest cavity, and that blood exuded from that wound, and that Danzy Simpson then fell down and died—if the jury should find that beyond a reasonable doubt from the evidence—do you have an opinion satisfactory to yourself as to what the cause of death of Danzy Simpson was? A. Yes, I do. Q. What is your opinion as to the cause of death? A. My opinion would be that the man died from internal hemorrhage due to rupture or puncture of blood vessels, or heart, in the chest cavity." Upon cross-examination, the doctor was first advised as to the shoulder wound. With reference thereto, he testified as follows: "Of course, we don't know where the bullet went after it hit the bone. It is entirely possible that the bullet could have ricocheted. If one probed and did not find the bullet, it is possible and more than likely that the bullet did ricochet. Assuming as a fact that the probe reached the bone and the bullet was not located, then it is more than likely that the bullet would have ricocheted. Such ricocheted bullet could have caused death. If such bullet entered the body of the deceased under the circumstances we have just assumed, and

another bullet entered the body of the deceased under the circumstances described by the Solicitor in his hypothetical question, the only way to determine definitely which bullet killed the deceased would be to perform an autopsy. You would want to know the position of each bullet."

Based upon the foregoing testimony, the jury returned a verdict of guilty of murder in the second degree. Judgment was pronounced thereon, imposing a prison sentence of not less than 20 nor more than 25 years, from which defendant appealed, assigning errors.

*Attorney-General Rodman and Assistant Attorney-General Bruton for the State.*

*Charles G. McLean for defendant, appellant.*

BOBBITT, J. These facts are undisputed. The death weapon was McNair's .22-caliber pistol. It fired twice. Two bullets lodged in Danzy's body. McNair had the pistol when it fired the first time.

These questions arise: Did defendant have the pistol when it fired the second time? If so, under what circumstances did it fire? Which shot, the first or the second, caused Danzy's death?

Defendant demurred to the evidence and moved for judgment as of nonsuit. G.S. 15-173. On such demurrer and motion, the evidence must be considered in the light most favorable to the State. Contradictions and discrepancies in the testimony of State's witnesses are to be resolved by the jury. *S. v. Robinson,* 229 N.C. 647, 50 S.E. 2d 740.

No autopsy was performed. No medical expert examined Danzy's body. Where each bullet ultimately lodged is not disclosed. Assuming the competency upon this record of the testimony of the deputy sheriff, of undisclosed qualifications as to probes made by him and what was indicated thereby, the evidence is somewhat less than satisfactory in the investigation of a matter of such great consequence. It indicates the wisdom of such legislation as Ch. 972, Session Laws of 1955, relating to Postmortem Medicolegal Examinations.

Furthermore, the evidence is silent as to fingerprints on the pistol. Some time after the second shot, and after Swindell had replaced the light bulb and there was light in the front room, Emma was wrapping the pistol in a piece of grey shirt. No one saw the pistol in her possession before that time. She made no attempt then or later to conceal it. Presumably, the State contended that she was wiping her fingerprints from the pistol. If there were *no* fingerprints thereon, this contention would have support; for, had she wiped fingerprints from the pistol, McNair's fingerprints as well as her own would have been removed. On the other hand, if investigation had disclosed McNair's fingerprints on the pistol and these alone, this would have been a strong circum-

stance in Emma's favor. Nothing was done to aid the jury as to this significant aspect of the case.

Considering the circumstantial evidence in the light most favorable to the State, under the rule as recently stated in *S. v. Stephens, post,* 380, we are constrained to hold that the evidence was sufficient to be submitted to the jury as to whether Emma had the pistol when the second shot was fired. Credible or incredible, there is evidence tending to exclude the hypothesis that one of the others in the room then had the pistol. McNair testified that he must have dropped it, when it fired the first time, albeit he knew it not until he had reached his home.

Moreover, applying the same rule, we are constrained to hold that the evidence was sufficient for submission to the jury as to whether the second shot penetrated the right side of Danzy's chest. Credible or incredible, all witnesses have testified that when the light went out in the front room Danzy was wearing only the long underwear. The State's theory is that Danzy put on the overalls and brown shirt *after* the light went out and *after* he had been wounded by the first shot. It taxes credulity to the utmost to picture Danzy, while wounded and under circumstances of violent commotion and of utter darkness, maneuvering to locate and to put on (at least partially) his overalls and brown shirt. The scene was such that one would not suppose that he was then moved by a sense of delicacy because insufficiently clad. Even so, the evidence posed a jury question.

The hypothetical question assumed a finding by the jury beyond a reasonable doubt of this vital fact, namely, "that Danzy Simpson then fell down and died." There is no evidence as to when Danzy fell or as to when he died, that is, within the period between the first shot and the time the light was replaced in the front room. All that the evidence discloses is that when the light was replaced, some time after the second shot fired, Danzy was on the floor, dead, with two bullets lodged in his body. True, McNair ventured to testify that when he left the house, "Danzy was standing near the bed." With the room in complete darkness, this would indicate extraordinary vision. The location of the bed, with reference to the front door, is not disclosed. And be it remembered that McNair's testimony is that he was two feet from the front door when Emma and Danzy assaulted him and the pistol fired the first time. However that may be, the undisputed testimony of Swindell is that two or three minutes elapsed between the first and second shots; and Swindell gave no testimony as to when Danzy fell or under what circumstances. Incorporation in the hypothetical question of an assumed finding as to this vital fact, of which there was no evidence, would be ground for a new trial. *S. v. Holly,* 155 N.C. 485, 71 S.E. 450; Stansbury, North Carolina Evidence, sec. 137.

However, we have reached the conclusion that defendant's demurrer to the evidence should have been sustained and the case dismissed as of nonsuit.

There is no evidence that Emma and McNair were acting in concert. *S. v. Barber,* 197 N.C. 554, 149 S.E. 857. The testimony of McNair expressly negatives any such idea. His testimony is positive that both Emma and Danzy ordered him out of their house and were actively attacking him to make him leave. An appreciable period of time elapsed between the two shots, if the evidence is considered in the light most favorable to the State. According to McNair, he was out of earshot when the pistol fired the second time. The two shots were independent of each other.

Of course, if the second shot was the sole cause of Danzy's death, or was a contributing proximate cause thereof, or accelerated his death, the case against this defendant would rest on different principles. *S. v. Scates,* 50 N.C. 420; *S. v. Hambright,* 111 N.C. 707, 16 S.E. 411; *S. v. Medlin,* 126 N.C. 1127, 36 S.E. 344; *S. v. Everett,* 194 N.C. 442, 140 S.E. 22. But here, the question is whether Danzy was dead or alive when the pistol fired the second time.

It was incumbent upon the State to establish that the bullet wound inflicted when the pistol fired while in possession of defendant was the proximate cause or a concurring or an accelerating proximate cause of Danzy's death. *S. v. Phelps,* 242 N.C. 540, 89 S.E. 2d 132; *S. v. Satterfield,* 198 N.C. 682, 153 S.E. 155; *S. v. Everett, supra.* We are constrained to hold that the evidence adduced by the State, which discloses that the medical expert could not determine in the absence of an autopsy which of the two wounds caused death, and in the absence of evidence as to when Danzy died or as to when and under what circumstances he fell to the floor, leaves in the realm of conjecture the question as to whether Danzy was dead when the pistol fired the second time. *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472; *S. v. Carter,* 204 N.C. 304, 168 S.E. 204. Whatever else it may be, it is not criminal homicide to shoot a dead body.

Having reached this conclusion, we need not consider whether the circumstantial evidence was sufficient to warrant the instructions to the jury as to the presumptions that arise when one person *intentionally* shoots another and thereby proximately causes his death. *S. v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322.

It seems appropriate to observe that no serious harm would likely have occurred were it not for the fact that the loaded pistol, then concealed in his hip pocket, was brought into the Simpson house by McNair. According to Dell's testimony, McNair had it in his hand soon after the original fuss between Emma and Danzy had started. It

seems natural that both Danzy and Emma should want him out of the house immediately. Whoever had the pistol when it fired the second time, McNair was responsible for its presence and availability if not for its use.

Reversed.