Walter Lee **PARMAN**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 20506.

United States Court of Appeals
District of Columbia Circuit.

Argued June 23, 1967.

Decided May 20, 1968.

Certiorari Denied Oct. 14, 1968.

See 89 S.Ct. 109.

Mr. Daniel A. Rezneck, Washington, D. C., with whom Mr. Abe Krash, Washington, D. C., (both appointed by this court) was on the brief, for appellant.

Mr. James A. Strazzella, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Alfred L. Hantman, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Senior Circuit Judge, and BURGER and LEVENTHAL, Circuit Judges.

BURGER, Circuit Judge:

This is an appeal from a judgment of conviction on two counts of a four count

indictment.[1] Appellant was found guilty of first degree murder, for which the jury recommended the penalty of life imprisonment, and assault with a dangerous weapon. The details of this bizarre and shocking crime, brought forth in a long and extensive trial, need not be repeated here. The government's case, based almost entirely upon circumstantial evidence of the highest scientific value, demonstrated that Appellant had committed the homicide in question, fled to the West Coast leaving a trail of evidence in his wake, and was apprehended. The scientific evidence amassed against Appellant was very strong, if not the strongest possible, outside of eyewitness testimony, needed to prove beyond a reasonable doubt that Appellant committed the crime. Appellant offered little defense on the merits, and principally relied on the insanity claim. On appeal, Appellant raises several issues.

▇▇▇ (1) Appellant's first claim is that the Trial Judge erred in refusing to grant a separate trial of the issues whether Appellant committed the acts charged and, assuming he did, whether he was criminally responsible for such acts. This "bifurcation" issue has recently been recognized by this court:

> substantial prejudice may result from the simultaneous trial on the pleas of insanity and "not guilty." The former requires testimony that the crime charged was the product of the accused's mental illness. Ordinarily, this testimony will tend to make the jury believe that he did the act. Also, evidence of past anti-social behavior and present anti-social propensities, which tend to support a defense of insanity, is highly prejudicial with respect to other defenses.

Holmes v. United States, 124 U.S.App. D.C. 152, 153, 363 F.2d 281, 282 (1966) (footnotes omitted). We contemplated in *Holmes* that motions for bifurcation are addressed to the "broad discretion" of the trial judge, *id.* at 154, 363 F.2d at 283; thus our review is limited to an inquiry whether that discretion was abused. Because the trial judge is, at the outset, likely to be unaware of the relevant facts relating to the merits defense or the claim of insanity, it is defense counsel's responsibility to raise the issue of bifurcation. Harried v. United States, 128 U.S.App.D.C. 330, 336, 389 F.2d 281, 284 (1967). In bringing the matter to the attention of the trial judge, counsel should indicate why he believes that a bifurcated trial is in the interest of justice, to prevent prejudice to the defendant on either the merits or the insanity claim.

▇▇▇ On the day of trial, counsel moved for a bifurcated trial, relying upon *Holmes*. He stated that there was a substantial basis for a claim of insanity which would prejudice his other defenses and indicated that he would challenge the government's burden of proof. He specifically conditioned his request, however, on the impanelling of two juries,[2] a procedure mentioned in

---

1. The indictment charged Appellant with (1) first degree murder, (2) felony murder committed while attempting to perpetrate rape, (3) assault with intent to commit rape, and (4) assault with a dangerous weapon. The government did not oppose dismissal of counts two and three and the case was submitted to the jury on count one, with an additional instruction on second degree murder, and count four.

2. COUNSEL: We feel in this case, Your Honor, we have a substantial insanity defense and we feel further it would have a prejudicial effect upon the merits of this case.

THE COURT: First of all, what is the defense outside of the insanity defense? Do you care to tell the Court?

COUNSEL: I can, Your Honor. I can say basically aside from our insanity defense we would be attacking the Government's case on the merits.

THE COURT: In other words you are denying the commission of the crime, I take it?

COUNSEL: We would be challenging the Government's having met their burden of proof beyond a reasonable doubt.

THE COURT: Is that all you want to say about it?

COUNSEL: About that particular item, Your Honor. *I would not make the re-*

*Holmes*.[3] Although bifurcation procedures are not specified in any statute or rule, as *Holmes* sets forth they are available within the discretion of the trial judge. Subsequently, at the close of the government's case, counsel renewed his motion for bifurcation in a *pro forma* fashion:

> In addition, I would at this time *renew my motion* for bifurcated trial based on the fact that entire evidence of the Government was circumstantial and that although I have previously mentioned to this jury on remarks voir dire, I was going to interpose defense of insanity had I been granted a bifurcated trial, I feel some reasonable arguments could have been made.

Tr. 965 (emphasis added).[4]

Appellant argues that intermingling the defense on the merits and the insanity claim necessarily worked to his prejudice. For example, he urges that there was prejudice to his insanity defense in the Trial Court's ruling inadmissible because of its inflammatory nature a photograph introduced to support the insanity claim. He also claims prejudice to his merits defense in that a recording of a sodium pentothal interview introduced as part of the insanity claim was, in fact, a confession and that, however well instructed, the jury could only have taken it as such.

■ However, these kinds of prejudice might have been substantially diminished by a bifurcated trial before a single jury. Defense counsel did not indicate, and the Trial Judge did not in-

quire, why the bifurcated trial should require two juries. Presumably counsel concluded he had sound tactical reasons; perhaps that an objective consideration of the insanity issue would be difficult of achievement by a jury which heard counsel take positions which the jury might regard as inconsistent. Defense counsel may have concluded that if there must be a single jury the possible benefits of bifurcation would be outweighed by a full presentation on mental condition before the jury withdrew to consider whether Appellant premeditated the killing, or even had malice or intent to kill. The fact that defense counsel may have hád meaningful reason for his position does not mean that he was entitled to two juries as a matter of right.[5]

■ Here the request for two juries was made in a case of first degree murder as to which the jury has a sentencing function. 22 D.C.CODE § 2404 (1967) provides that a unanimous jury can recommend life imprisonment in lieu of the otherwise mandatory death sentence. We may fairly assume that Congress did not consider the possibility of a defendant who sought two juries as an element of fairness, and that it presumed, without reflection on that problem, that the jury determining punishment would be the same jury as the one which heard the evidence, both the evidence of guilt and the evidence tendered as to defenses and mental disease. We need not determine whether these considerations would be overborne in a case where a bifurcated trial before one jury entailed serious and substantial

---

*quest for bifurcation unless Your Honor were considering impanelling two juries because I feel bifurcation might be prejudicial if we would have the same jury considering both, and therefore my request would be conditioned upon Your Honor viewing it in that fashion.*
Motion for Bifurcated Trial Tr. 2–3 (emphasis added).

3. The court not only has a broad discretion in considering bifurcation, but also in prescribing its procedure, the form of the charge and submission of the questions to the jury, * * * and even the

impaneling of a second jury to hear the second stage if this appears necessary to eliminate prejudice.
124 U.S.App.D.C. at 153, 363 F.2d at 283.

4. We view Appellant's renewed motion for bifurcation as also conditioned on two juries. If in fact it was for bifurcation before one jury it was incumbent on counsel to so inform the Trial Judge.

5. Courts must also be mindful that if separate juries are to be used, the second jury must be informed as to what has gone on before, so that its limited function will be understood.

prejudice that could not be tolerated, perhaps even rising to denial of fair trial. In the present case at least, the disadvantages of a trial without bifurcation might have been substantially diminished by a bifurcated trial before one jury. Accordingly, the condition of two juries, which may well have been a sound tactical approach by defense counsel, cannot be elevated to the level of a legal right that could not be denied consistently with sound discretion.

■ (2) Appellant's second claim relates to alleged error in the admission of various items of evidence; namely, (a) evidence seized during a claimed unlawful search and seizure of Appellant's apartment, (b) a statement of Appellant taken in Los Angeles allegedly during a period of "unnecessary delay" in violation of FED.R.CRIM.P. 40(b), and (c) the admission of a bedspread into evidence without adequate evidentiary foundation.

The homicide occurred in the early morning hours of Saturday, January 9, 1965. During the course of the investigation conducted later that day the police learned from a friend of the deceased that the deceased, this friend, and Appellant had been out drinking and dancing the previous evening; that Appellant and the deceased had left the restaurant in the early morning hours of January 9, 1965; and that Appellant stated that he would take the deceased to the friend's house later, but never arrived. The circumstances that a felony had been committed and that Appellant was the last known companion of the victim, gave police probable cause to believe that Appellant had committed the crime. The investigation inescapably led them at once to his apartment. However, they did not get an arrest or search warrant. The District Judge who presided over the motion to suppress found as follows:

> Upon arrival at the apartment building [on the evening of January 9, 1965] accompanied by a friend of the deceased who had been in the apart-

ment with the deceased and the occupant the preceding evening and who identified the apartment in question, the police officers, observing a light reflecting through the drawn venetian blinds of the apartment and thinking that they heard the sound of someone moving in the apartment, thereupon, after giving the required notice, entered the apartment but found no one there.

Police officers then remained in the apartment for the purposes of arresting Appellant if he should return. During the course of their stake-out, the officers observed in plain view various items of probative value. The following day, Sunday, January 10, one of the officers returned to the premises again without either an arrest or search warrant. He testified that he did so "to obtain evidence." On Monday, January 11, 1965, a warrant was issued to search and seize certain named items of evidence which had been observed during the stake-out and the unauthorized Sunday search. Pursuant to the warrant these items were seized along with other items not specifically described in the warrant.

The Judge hearing the motion to suppress made a finding on the basis of testimony that Appellant had abandoned the premises:

> The Court is also of the opinion that the defendant had abandoned the property now sought to be suppressed and is without standing. The conclusion is inescapable that on January 9, 1965, the defendant abandoned the premises and any property therein and left this jurisdiction with no intention to return. He immediately sought to conceal his identity by adopting an alias and subsequently taking up residence in Los Angeles under an assumed name.

Transcript of Motion to Suppress, October 7, 1965, p. 2.

Appellant claims that the finding of abandonment is not supported factually or legally, and goes on to argue that the

original search violated this Court's holding in Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958), since there were no "necessitous circumstances" justifying the entry without a warrant; he further claims that the subsequent general exploratory and warrantless search of January 10 was equally unlawful under *Morrison,* and that the seizure of various evidentiary items on January 11, pursuant to a warrant and otherwise now permissible under Warden Md. Penitentairy, v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L. Ed.2d 782 (1967), is justifiable only when incident to a constitutionally permissible search, and he argues the search of January 10 was not such. Thus, Appellant argues that the seizure on January 11 was the fruit of the unlawful entry and search of the previous two days. Finally, Appellant contends that the seizure of various evidentiary items other than those expressly noted in the search warrant violated the requirements of the fourth amendment and Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927), that the warrant must particularly describe the items to be seized, and cannot be justified by the catch-all phrase, "instrumentalities," which the warrant contained.[6]

 We need not reach all the claims which Appellant poses in this regard since we are satisfied the record supports the finding that an abandonment in fact and in law had occurred. We are disturbed, however, at the police failure to obtain a warrant for the Sunday search; whether this failure was a careless oversight or indifference to constitutional provisions, we cannot discern. It is difficult to see why, in a capital case, trained officers would fail to take such a simple and obvious step when time permitted. However, Appellant lacks standing to raise the fourth amendment issue as a reason for excluding the evidence because he had abandoned the premises prior to the time of search.

The finding of abandonment was premised on the fact that Appellant fled Washington almost immediately after the crime was committed and was in Ohio, registered under an assumed name at a tourist home, when the search occurred. He thereupon sold his car and appeared in Los Angeles where he also engaged an apartment under another assumed name through a lease which extended beyond the period of time for which the tenancy of his Washington apartment had been fixed. While in Los Angeles, Appellant sought a job and bought furniture and clothing.

Appellant counters this evidence by arguing that his Washington lease had not terminated, he never turned in his key, and the management never took steps to reclaim the premises. But most importantly, Appellant argues that the police never treated the premises as abandoned. In this regard Appellant relies upon the fact that the warrant described the apartment as "occupied" by Appellant; that during the time the police maintained the stake-out they had no idea of Appellant's whereabouts and, indeed, the stake-out indicated they expected him to return; and that when the property was seized the police officers treated it as Appellant's, not as abandoned property.

Appellant's contentions overlook some significant factors: (a) there was no occasion for the Washington lessor to reclaim premises; (b) common sense and elementary caution would command that the police refrain from indulging in speculation or prediction whether Ap-

---

6. Appellant's brief, written before the *Hayden* decision, followed the recent trend of writings concerning general exploratory searches, mere evidence, and "instrumentalities" of crime. *See, e. g.,* Newton, The Mere Evidence Rule: Doctrine or Dogma?, 45 TEXAS L.REV. 526 (1967); Note, 54 GEO.L.J. 593 (1966). In light of *Hayden* Appellant has withdrawn his argument as to mere evidence but at the same time asserts the illegality of the seizure here because it was not incident to a lawful search.

pellant had abandoned or would return, but rather should prepare for either eventuality; (c) action by police in holding the seized property was consistent with the imperative need to preserve the evidence.

 We are, of course, mindful of the admonition that it is not necessary to import the subtle refinements of property law into the law surrounding search and seizure. Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The question of abandonment is "an ultimate fact or conclusion based generally upon a combination of act and intent," Friedman v. United States, 347 F.2d 697, 704 (8th Cir.), cert. denied, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965). And a valid finding of abandonment deprives Appellant of standing to assert a claim that the items of evidence in question were improperly "seized." *Compare* Abel v. United States, 372 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). We are satisfied that on this record there was abundant evidence to support the finding of abandonment and the conclusion that Appellant lacks standing to challenge legality of the search.

Appellant in his brief places principal reliance upon the deterrence rationale of the fourth amendment.[7] He claims that to "deny appellant standing in this case would be to encourage warrantless searches undertaken in the hope they could be retroactively justified if it turned out that the occupant had fled the jurisdiction." We think the thrust of such reliance is misplaced. Since the much more likely probability is non-abandonment in most cases, we do not think our holding in any sense encourages reckless entries on the remote possibility that abandonment has occurred.

 Relying upon United States v. Olsen, 245 F.Supp. 641, 645 (D.Mont.

1965), Appellant points out that to justify a search by a subsequent finding of abandonment where, at the time, the officers conducting the search have no reason to believe that abandonment has occurred, places serious limitations on the deterrence rationale of the fourth amendment. This "intriguing" argument has been rejected elsewhere. *See* Judge Blackmun's careful analysis in Feguer v. United States, 302 F.2d 214, 248–250 (8th Cir.), cert. denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962). We think this limitation on the deterrent effect of the exclusionary rule is implicit in the rule that a third party cannot object to illegally seized evidence. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). No recent Supreme Court decision hints any curtailing of this rule, and we see no reason for treating a person who abandons property before the search any differently from a third party. *Cf.* United States v. Bozza, 365 F.2d 206, 222–225 (2d Cir. 1966).

 Appellant's second claim under this issue of the admissibility of evidence is that the statements made to F.B.I. agents after his arrest in his apartment in Los Angeles, and subsequently introduced at trial, were made during a period of unnecessary delay in violation of Fed.R.Crim.P. 40(b). The facts, as derived from the pre-trial hearing Judge's memorandum on the motion to suppress, are these: F.B.I. agents, with knowledge of an outstanding arrest warrant for Appellant issued for unlawful flight to avoid prosecution for murder, went to an apartment in Los Angeles on information concerning the name of George Farr. They inquired of the manager and were informed that George Farr was a tenant, just then having dinner with the manager. The agents saw George Farr and identified him from photographs as Appellant. They intro-

---

7. The general deterrence rationale of the fourth amendment has recently found support in several Supreme Court decisions. *See* Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). See also Note, 34 U.Chi.L.Rev. 342 (1967).

duced themselves to him and he gave his alias to them. Upon further observation and comparison of identification characteristics the agents placed him under arrest on the charge specified in the warrant. They then warned Appellant of his rights[8] and made a preliminary search of his person whereupon they discovered an identification card with the name of Walter Parman on it. Within a span of three or four minutes, in response to a casual question by an agent, Appellant stated that he was "glad that it was [over]," that he was attempting to establish an assumed identity, and that he was "tired of running." He also questioned the agents as to how they had caught up with him, and informed them of his attempts to change his identity after viewing the posters in post offices.

Appellant was subsequently interviewed in the Los Angeles police station, and again interrogated while being transported to the courthouse for his preliminary hearing. Appellant received an initial preliminary hearing on the arrest warrant for unlawful flight to avoid prosecution. Two days later he received a second preliminary hearing on the murder charge, which was continued until a week later. At each hearing he was fully advised of his rights. After the postponed hearing he was interviewed on two occasions by police officers from Washington, and his Los Angeles apartment was searched pursuant to a warrant.

The pre-trial hearing Judge excluded all statements and items of evidence

seized except those statements made immediately upon arrest and the voluntary statements made to Washington police officers after the preliminary hearing on the murder charge was postponed. The former were admitted into evidence but the government did not use the latter statements in evidence. On appeal Appellant seeks to exclude those statements which were admitted as "threshold statements" because, it is alleged, they were obtained during a period of "unnecessary delay" in violation of FED. R.CRIM.P. 40(b).

Rule 40(b), dealing with arrest in a district distant from that of the commission of the offense, incorporates the standard of FED.R.CRIM.P. 5 and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), dealing with presenting an accused before a commissioner or magistrate. Greenwell v. United States, 119 U.S.App.D.C. 43, 46 n. 5, 336 F.2d 962, 965 n. 5 (1964); see also Jones v. United States, 119 U.S.App.D.C. 284, 342 F.2d 863 (1964) (en banc). The pre-trial hearing Judge, as well as the Trial Judge on the renewed motion to suppress, found that these were threshold statements of a spontaneous nature, and therefore admissible under familiar Mallory opinions.[9] Our review of the testimony taken at the pre-trial hearing and on the renewed motion to suppress satisfies us that there was no error in admitting these statements and no violation of Rule 40(b).

Appellant's final assertion in his broad claim of improperly admitted evi-

---

8. Although the warnings given fell short of those required in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1967), the warning and the trial testimony concerning it occurred in advance of that opinion. Thus, under Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and subsequent decisions of this court, e. g., Mathies v. United States, 126 U.S. App.D.C. 98, 101 n. 2, 374 F.2d 312, 315 n. 2 (1967), Miranda is inapplicable.

9. See United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944);

Mathies v. United States, 126 U.S.App. D.C. 98, 374 F.2d 312 (1967); Perry v. United States, 121 U.S.App.D.C. 29, 347 F.2d 813 (1964), cert. denied, 382 U.S. 959, 86 S.Ct. 438, 15 L.Ed.2d 362 (1965); Ramey v. United States, 118 U.S.App.D. C. 355, 336 F.2d 743, cert. denied, 379 U.S. 840, 85 S.Ct. 79, 13 L.Ed.2d 47 (1964); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959); Perry v. United States, 102 U.S.App.D.C. 315, 253 F.2d 337 (1957), cert. denied 356 U.S. 941, 78 S.Ct. 785, 2 L.Ed.2d 816 (1958).

dence concerns the admission into evidence of a bedspread similar to the one on the bed in Appellant's apartment on the night of the murder but not the actual bedspread which was never recovered. As a foundation for this evidence the government demonstrated that the bedspread had been identified by the deceased's girl friend as being on the bed in the apartment on the night of the murder. The police then located the store at which Appellant purchased the original bedspread. The saleswoman at the store identified Appellant, testified that she recalled Appellant's purchases, and identified the bedspread purchased by the police and introduced into evidence as the same type sold to appellant. The government also introduced the advertisement, showing a colored picture of the bedspread, which was found outside Appellant's apartment in a trashcan. An expert witness subsequently testified that the bedspread introduced into evidence contained the same fibers, the same materials, and was of the same color, as fibers found on sheets left on the apartment bed, found in Appellant's discarded car, and found on the deceased's clothing and Appellant's clothing which had been discarded in West Virginia.

■ Appellant claims that the bedspread exhibit should have been excluded because it was not the original bedspread purchased by him. Alternatively, Appellant claims that the knowledge of the bedspread was obtained from Appellant during statements made to police officers in Los Angeles after his preliminary hearing on the murder charge had been continued. Appellant claims that this uncounselled interview violates our holdings in Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964 (1964), and Queen v. United States, 118 U.S. App.D.C. 262, 335 F.2d 297 (1964), and the spirit, if not the letter, of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Moreover, Appellant argues, since the interview occurred only a few days after statements which were taken earlier and which were excluded, the statements made in this interview retained this primary illegality and should be excluded as "poisoned fruit," citing Killough v. United States, 114 U.S.App.D.C. 305, 315 F.2d 241 (1962) (*en banc*). No objection was advanced on this ground which in itself is sufficient to preclude reversal. Deans v. United States, 126 U.S.App.D.C. 70, 374 F.2d 284 (1966). But it can hardly be asserted that the trial judge committed plain error in not "guessing" that the bedspreads were the fruit of a statement that (a) was not used at trial, and (b) was held admissible by the pre-trial hearing Judge in a ruling not challenged at trial by renewal of the motion to suppress, or otherwise.

(3) The third issue raised is Appellant's claim that the Trial Judge erred in not directing a verdict of not guilty by reason of insanity. In support of his position Appellant emphasizes two points: (a) that the circumstances of the homicide are so bizarre and the mutilations of the body so shocking that only a severely disturbed and sadistic mentality could have perpetrated the crime; (b) that the evidence offered by the government on the question of sanity is incompatible with the conclusion of sanity beyond a reasonable doubt. Appellant buttresses these points by noting that the government psychiatrists actually spent very little diagnostic time with Appellant and were unaware of much of the information obtained by the defense psychiatrists.

■ We note at the outset that because of the complicated nature of the question of responsibility, we have fashioned a rule that requires "an unusually strong showing to induce us to reverse a conviction because the judge left the crucial issue of criminal responsibility with the jury," King v. United States, 125 U.S.App.D.C. 318, 324, 372 F.2d 383, 389 (1966). Since development of the doctrine of McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (*en banc*), we have been "chary of directed verdicts of not guilty by reason of insanity, even where expert testi-

mony is uncontradicted," King v. United States, supra 125 U.S.App.D.C. at 322, 372 F.2d at 387. With these standards in mind, we cannot say the District Court erred in refusing to direct a verdict of not guilty by reason of insanity.

We have carefully reviewed the contentions and the evidence introduced by both the defense and the government. We disagree with the Appellant's characterization of the government psychiatrists' testimony as "mere labels." Our examination of the transcript reveals detailed background testimony with the opportunity for full discussion by the various psychiatrists testifying as to their diagnoses. The objections which Appellant makes go only to the weight which the jury was to accord the complex evidence on the issue of responsibility. The government rebuttal psychiatrists raised a jury question even assuming their examination of Appellant was not as complete as would be ideal. We must remember that a directed verdict of not guilty by reason of insanity is the rare exception and not to be lightly taken. Here there was more than a colorable question as to whether capacity was proven by the government. On this record we cannot say that the Trial Judge, after hearing all the testimony, was required to conclude that the evidence was sufficient "to compel a reasonable juror to entertain a reasonable doubt concerning the accused's responsibility"; McDonald v. United States, *su-pra* 114 U.S.App.D.C. at 123, 312 F.2d at 850.

(4) Appellant's final issue is that the evidence does not prove, beyond a reasonable doubt, that Appellant was guilty of premeditated and deliberate murder, *i. e.*, first degree murder. Appellant claims that the evidence discloses a homicide committed on impulse, the very antithesis of, in the vernacular, a cold-blooded and calculated murder which the first degree murder statute was designed to deter, and the senseless act of a man acting in a state of mind that was the very negation of deliberation.

We have only recently had the opportunity to re-examine our first degree murder statute, Austin v. United States, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967). *Austin* reinforced our prior decisions [10] to the effect that "some appreciable time" must elapse for the consideration and reflection which amount to deliberation but that no particular length of time is necessary and the time need not be long, id. at 184–188, 382 F.2d at 133–137. The passage of sufficient time for such deliberation does not itself permit the inference that the requisite thought process occurred.[11] Here the evidence further discloses that, while in Appellant's apartment, the deceased was assaulted, bound with a rope by the hands and further tied to a chair, and then killed by strangulation from behind while still tightly bound. Medical testimony was that the victim's body showed

---

10. *E. g.*, Frady v. United States, 121 U.S. App.D.C. 78, 348 F.2d 84, cert. denied, 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965); Bullock v. United States, 74 App.D.C. 220, 122 F.2d 213 (1941); Bostic v. United States, 68 App.D.C. 167, 94 F.2d 636 (1937), cert. denied, 303 U.S. 635 (1938); *see also* Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946).

11. We said in *Austin:*
> Certainly the charge should focus primarily on the defendant's actual thought processes in terms of meditation and conscious weighing of alternatives. The "applicable time" element is subordinate, necessary for but not sufficient to establish deliberation.

127 U.S.App.D.C. at 187, 382 F.2d at 136.

> The charge on premeditation and deliberation in this case stressed only the elapsing of sufficient time for the necessary reflection, and did not focus on the requirement that "in this interval there was a further thought, and a turning over in the mind—and not a mere persistence of the initial impulse of passion." Id. at 188, 382 F.2d at 137. However, this case was tried before *Austin* and no objection was made to the charge; nor was a different instruction requested. Also, unlike the situation in *Austin,* the court used the "appreciable time" language and articulated the elements of second degree murder.

evidence of torture before death. The medical testimony also indicated that the actual strangulation process required sustained pressure. The proof here shows not only a time lapse but also acts of such a nature and quality that, even without testimony of motive, the jury could reasonably be convinced that there was methodical preparation that reflected planning and premeditation rather than a mere abandonment to impulse, passion, or frenzy.

The evidence before the jurors was such that they might have properly concluded one way or the other whether Appellant was capable of and engaged in the reflection necessary to warrant a verdict of first degree murder. Since either conclusion was a permissible one, it presented an issue for resolution by the jury and not by the court. Accordingly, we find no error.

Affirmed.