STATE OF NORTH CAROLINA v. MILAN ALBERT LeDUC

No. 781SC945

(Filed 19 August 1980)

1. Narcotics § 4– conspiracy to possess marijuana – sufficiency of evidence

The State's evidence was sufficient to support defendant's conviction for conspiracy to possess 22.4 pounds of marijuana where it tended to show that defendant, an experienced operator of seagoing vessels, chartered a fishing trawler which was then located in Alabama; defendant was accompanied by two male companions when the negotiations for the charter occurred; the trawler was sailed down the Gulf Coast into the waters off the coast of Columbia, South America, and thence up the Atlantic Coast into North Carolina waters, at some point along the way picking up a load of marijuana; defendant's fingerprints were found on the notebook on which navigational notations were entered for the course of the voyage, thereby supporting the inference that defendant served as navigator; the trawler docked at night at an isolated point in Dare County and was almost immediately thereafter met by persons who arrived at the scene in two trucks; marijuana was unloaded from the boat into one or both of the trucks, and three persons left the scene together in the second truck; and 22.4 pounds of marijuana were found in a plastic bag on the boat.

2. Searches and Seizures § 3– officer's initial boarding and search of boat – determination if ill or dead persons aboard – legality

A deputy sheriff's initial boarding of a fishing trawler moored to a dock in an isolated area of Dare County and his initial search of the vessel were justified by possibly exigent circumstances where the trawler had been at the dock for over four days; all of the doors and windows of its deckhouse were open; no one was seen in or about the trawler; the trawler was tied in an unusual manner; and the deputy was not engaged in a search for evidence to be used in a criminal prosecution but was engaged in determining if anyone was aboard who was ill or dead.

3. Searches and Seizures § 3– abandonment of boat by defendant – warrantless search by officers – no expectation of privacy

Defendant abandoned a fishing trawler when he left it at a dock in an isolated area of Dare County and thereafter had no legitimate expectation of privacy with reference to it or its contents where he left the trawler under cover of darkness carelessly tied alongside a public dock adjacent to a public highway; he left it without spring lines to control its movement, demonstrating an indifference to its safety; he left it unattended, with all doors and windows of its deckhouse open; he left it without obtaining permission of the operators of the dock to do so and without notifying anyone in the small surrounding community of the identity of the trawler, his own identity, or his intention to return; he never did return to the dock or the county where the trawler was moored until much later when he was apprehended in Florida by agents of the F.B.I. Accordingly, none of defendant's rights were

State v. LeDuc

violated by an intensive search without a warrant which officers made of the trawler and its contents after it had been moved to a Coast Guard station, and evidence obtained as a result of that search was properly admitted in defendant's trial for conspiracy to possess marijuana.

4. **Criminal Law §§ 58, 80– allowing jury to compare signatures – necessity for expert testimony**

The trial court erred in permitting the jury, unaided by competent opinion testimony, to compare a signature on a charter boat agreement with samples of defendant's signature for the purpose of determining whether the signature on the agreement was that of defendant, and the charter boat agreement was improperly admitted into evidence where there was no competent evidence that defendant was the person who signed it. G.S. 8-40.

5. **Criminal Law § 50.1– testimony by navigation expert**

The trial court properly permitted a witness who was qualified and accepted by the court as an expert in navigation on the high seas to testify as to the significance of certain charts and navigational notations found on a fishing trawler used to transport marijuana.

Judge ARNOLD dissenting.

APPEAL by defendant from *Fountain, Judge.* Judgment entered 19 May 1978 in Superior Court, DARE County. Heard in the Court of Appeals 30 January 1979.

Defendant was indicted for felonious possession of 22.4 pounds of marijuana and for conspiring "with one or more co-conspirators who's [sic] names are unknown" to feloniously possess 22.4 pounds of marijuana. The cases were consolidated for trial, and defendant pled not guilty to each charge. At trial before the jury, the State presented evidence to show the following:

On Wednesday, 18 May 1977, Leland Wise, a longtime resident at Stumpy Point in Dare County, noticed a 65-foot diesel-powered fishing trawler bearing the name "Frances Ann" moored to the dock adjacent to Highway 264 at Stumpy Point. This dock, which was the only docking facility at Stumpy Point, was partially owned by the county and was normally used by local boats only for short periods of time to unload fish. Wise noticed that the shrimp nets on the "Frances Ann" were not hoisted in the rigging in the manner customarily employed by local fishermen nor was the boat secured to the dock in the

usual manner. It was secured by only two light lines, one at the bow and one at the stern, each line being about one-half the diameter of the lines customarily used for mooring such boats, and there were no spring lines in between to control the movement of the boat forward and backward. All of the doors and windows on the deckhouse were open, and Wise did not see any person on or about the boat.

During the succeeding days Wise continued to observe the boat and saw no change in its condition nor did he see anyone on or about it. On Sunday, 22 May 1977, he telephoned the Dare County Sheriff's Department and reported what he had seen. In response to that call, Deputy Sheriff Pledger came to the dock where the "Frances Ann" was moored. After conferring with Wise, Deputy Pledger walked up the dock to the bow section of the trawler and looked in through the open wheelhouse door. Seeing no one in the wheelhouse, he walked back down the dock toward the aft section of the trawler and looked through the open galley door. Still seeing no one, he called out, "Is anybody on board?". Receiving no response, Deputy Pledger, accompanied by Wise, boarded the trawler. He stepped to the galley door and again asked if anybody was on board. Again receiving no reply, he entered the galley.

In the galley, Deputy Pledger saw pots and pans in the sink, a coffee pot on the stove, paper plates on the table, and food lying around. He noticed a faint odor of marijuana and saw marijuana seed and green vegetable material, as well as a homemade tinfoil pipe, on the galley table. Passing through the galley area, Deputy Pledger stepped forward into the captain's quarters. Beneath the bunk in the captain's quarters was a cabinet or cupboard, the doors to which were open. Deputy Pledger could see into the cabinet and in the cabinet was a black plastic trash bag, inside of which was a brown paper bag. The two bags were torn open at the top, and the deputy could see a quantity of golden brown vegetable material inside. He reached in and got a handful of the vegetable material, looked at it, smelled it, noted it had the odor of marijuana, and then put it back in the bag.

Deputy Pledger next moved forward into the wheelhouse. A torn section of a chart of Stumpy Point Bay lay in front of the helm. He then returned aft through the deckhouse to the crew's quarters immediately behind the galley. There he found two bunks with rumpled bed linens, sleeping bags, and miscellaneous shoes, boots, and clothing. He went out on deck and opened the hatch of the after fish hold. A strong odor of marijuana came from this hold. He entered the hold and observed marijuana seed and green vegetable material on the floor and walls. He completed his inspection of the boat by entering the engine room and the forward hold.

Finding no one on the boat, Deputy Pledger conferred by his car radio with the Dare County Sheriff's Department. He then tried to start the engine on the "Frances Ann," but found the batteries were dead. After obtaining assistance from a local mechanic, he was able to start the engine, and he then ran the "Frances Ann" to the Coast Guard Station at Oregon Inlet, where he was met by the sheriff and other law-enforcement officers. During subsequent days as intensive search of the "Frances Ann" was made by Coast Guard and law-enforcement officers, including agents of the State Bureau of Investigation and the U.S. Customs Service. The boat was finally moved to the dock at Manteo, where the owners, Andrew J. Tiner and Charles Daniels of Fort Myers Beach, Florida, were ultimately permitted to reclaim it.

Raynor Laverne Twiford, a commercial fisherman who lived about 700 feet north of the Stumpy Point dock at which the "Frances Ann" was found tied, testified that some time between 2:00 and 2:30 a.m. on 18 May 1977 he woke up and went out on his porch to smoke a cigarette. He observed the "Frances Ann" at the dock at that time. It had not been there when Twiford had been at the dock about 10:00 p.m. the previous evening. It was a beautiful night without any wind, and Twiford heard a truck coming up the highway from the south. The truck backed up to the dock where the "Frances Ann" was moored. The truck had an aluminum body and a white cab and appeared to be a normal fish truck. Twiford heard noises which indicated something was being unloaded from the boat. The truck remained at the dock 20 minutes at the most. Then it pulled out

and headed north up the highway past Twiford's house. The lights on the truck were not turned on until it was about 200 yards north of Twiford's house, and Twiford did not see its occupants. After the truck left, three people left the dock where the "Frances Ann" was tied and went to the Wahoo Sportsman Fish House, an unlocked building about 200 feet south of Twiford's residence, where they remained about five minutes. Then they went back down to the dock where the "Frances Ann" was moored and drove off to the south in what sounded like a pickup truck. Twiford could not say whether the three people he saw were men or women. Twiford remained awake until he left on his boat at 4:30 a.m. and observed no more activity in the vicinity of the "Frances Ann."

SBI chemist N.C. Evans testified that his analysis showed that the bags found in the cabinet in the captain's quarters contained 22.4 pounds of marijuana and that vegetable material collected from the hold was also marijuana.

Deputy Sheriff C.C. Duvall testified that when he searched the boat while it was at the Coast Guard Station, he found marked navigational charts of the waters between North Carolina and South America on board the "Frances Ann." U.S. Customs Special Agent Michael Bromm testified he found vegetable debris on the floor in the aft hold, the ice area just forward of the aft hold, and the forepeak area. In all three spaces he observed burlap impressions in the paint on the walls to a height of 5½ feet to 6½ feet in the aft hold, 5 to 6 feet in the ice area, and 3½ feet in the forepeak area. The combined volume of these three spaces was about 370 cubic feet.

Andrew J. Tiner and Charles Daniels, commercial fishermen of Fort Myers Beach, Florida, testified that they bought the "Frances Ann" on 14 April 1977. The boat was then located at Bayou LaBatre, Alabama. Shortly after the purchase, a man who gave his name as "Milan LeDuc," accompanied by two male companions, talked with Tiner and Daniels twice at the shipyard in Alabama where the boat was located. The same man and the same two companions later approached Tiner and Daniels in Florida and discussed chartering the "Frances Ann." A Bare Boat Charter Agreement, introduced into evi-

dence, was signed on 26 April 1977 by Daniels on behalf of the owners. The instrument named "Milan A. LeDuc" of 6606 Faul St., Tampa, Florida as charterer, and chartered the boat for an initial term of three months at a rental of $3,500.00 per month payable in advance. At the time this agreement was signed by Daniels, it already bore the signature, "Milan LeDuc," on the line to be signed by the charterer. When the charter agreement was being discussed, the person with whom the owners dealt produced a Florida driver's license bearing the name "Milan A. LeDuc" and a picture which appeared to be that of the person with whom they were dealing. Tiner testified that the charterer at this meeting was accompanied by the same two individuals who had been with him during the previous encounters. Neither Tiner nor Daniels would identify the defendant at trial as the man who had chartered the "Frances Ann." Daniels testified that there had been no marijuana aboard the trawler when he inspected it in Alabama.

SBI fingerprint experts testified that as result of their search of the "Frances Ann" while it was at the Coast Guard Station, they had lifted approximately 30 latent fingerprints from various articles found on board, and that of these 19 were those of the defendant, one was Deputy Pledger's, and the remainder were fingerprints of unknown persons. A Coast Guard officer testified that in 1973 a license had been issued to "Milan A. LeDuc" to operate tow vessels up to 200 miles offshore, and an SBI expert testified that the left thumbprint which appeared on the license application was that of the defendant. There was also evidence that the "Frances Ann" was electronically well equipped for navigation at sea, having a Loran A, a Loran C, a group of CBs, a VHF, and a radar. Charts found aboard the "Frances Ann," including one entitled "South America, Colombia, and Venezuela, North Coast," and notations on sheets in a tablet or notebook found on board indicated that someone had used them to chart a course down the Gulf Coast from the vicinity of Mobile, Alabama, to points in waters off the coast of Colombia, South America, and up the Atlantic Coast to Stumpy Point, North Carolina. Defendant's fingerprints were found on a sheet in this notebook.

Other evidence will be referred to in the opinion.

The defendant did not present evidence. The jury found him not guilty on the charge of possession of marijuana and guilty of conspiring to possess marijuana. From judgment imposing a prison sentence of five years, defendant appeals.

*Attorney General Edmisten by Assistant Attorney General Donald W. Grimes for the State.*

*Larry G. Turner; and White, Hall, Mullen, Brumsey & Small by Gerald F. White for defendant appellant.*

PARKER, Judge.

[1] Defendant assigns error to the denial of his motions for nonsuit, contending the evidence was insufficient to warrant submitting the conspiracy charge against him to the jury. We do not agree.

The manner in which the evidence must be viewed by the court upon the defendant's motion for judgment of nonsuit in a criminal case was stated by Lake, J., speaking for our Supreme Court in *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), as follows:

> Upon the defendant's motion for judgment of nonsuit in a criminal action, the question for the court is whether there is substantial evidence of each essential element of the offense charged, or of a lesser offense included therein, and of the defendant's being the perpetrator of such offense. If so, the motion is properly denied. *State v. Rowland*, 263 N.C. 353, 139 S.E. 2d 661; *State v. Virgil*, 263 N.C. 73, 138 S.E. 2d 777; *State v. Goins* and *State v. Martin*, 261 N.C. 707, 136 S.E. 2d 97. In making this determiniation, the evidence must be considered in the light most favorable to the State and the State is entitled to the benefit of every reasonable inference to be drawn from it. *State v. Goines*, 273 N.C. 509, 160 S.E. 2d 469; *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679. Contradictions and discrepancies in the testimony of the State's witnesses are to be resolved by the jury and, for the purposes of this motion, they are to be deemed by the court as if resolved in favor of the State.

*State v. Church,* 265 N.C. 534, 144 S.E. 2d 624; *State v. Simpson,* 244 N.C. 325, 93 S.E. 2d 425. In determining such motion, incompetent evidence which has been admitted must be considered as if it were competent. *State v. Cutler, supra; State v. Virgil, supra.*

The test of the sufficiency of the evidence to withstand the motion for judgment of nonsuit is the same whether the evidence is circumstantial, direct or both. *State v. Cutler, supra; State v. Rowland, supra; State v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431. There is substantial evidence of each element of the offense charged, or of a lesser offense included therein, and of the identity of the defendant as the perpetrator of it if, but only if, interpreting the evidence in accordance with the foregoing rule, the jury could draw reasonable inference of each such fact from the evidence. *State v. Rowland, supra.* If, on the other hand, the evidence so considered, together with all reasonable inferences to be drawn therefrom, raises no more than a suspicion or a conjecture, either that the offense charged in the indictment, or a lesser offense included therein, has been committed or that the defendant committed it, the evidence is not sufficient and the motion for judgment of nonsuit should be allowed.

278 N.C. at 567, 180 S.E. 2d at 759-60.

The evidence in the present case, considered in accordance with the above principles, is sufficient to support, though not to require, findings as follows:

Defendant, an experienced operator of seagoing vessels, on several dates in April 1977 negotiated with the owners of such a vessel to charter it from them. These negotiations took place in Alabama, where the boat was located, and in Florida, where the owners lived. On each occasion when these negotiations took place, defendant was accompanied by two male companions. The negotiations were finally successfully concluded on 26 April 1977, when the owners signed a charter agreement chartering the boat to defendant for an initial period of three months. Thereafter defendant took the boat from the shipyard

at Bayou LaBatre, Alabama, where it was located when the charter agreement was signed, and sailed it down the Gulf Coast into waters off the coast of Colombia, South America, and thence up the Atlantic Coast into North Carolina waters, at some point along the way picking up a load of marijuana. Defendant's fingerprints on the notebook on which navigational notations were entered charting the course of the voyage reasonably support the inference that he was the person who served as navigator. At some time between 10:00 p.m. on 17 May 1977 and 2:30 a.m. the next day, the boat docked in the darkness at Stumpy Point in Dare County, N.C. During that four-and-a-half hour interval it was met by persons unknown who arrived at the dock in two trucks. Marijuana was unloaded from the boat into one or both of these trucks, after which both trucks left the scene, three persons leaving together in the second truck. These findings, all of which are supported by the evidence either directly or by reasonable inference, would support a jury verdict finding defendant guilty of the crime of conspiracy to feloniously possess more than one ounce of marijuana in this State.

A criminal conspiracy occurs when there is an "agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way." *State v. Parker*, 234 N.C. 236, 241, 66 S.E. 2d 907, 912 (1951). The offense is complete when the agreement is made, the conspiracy itself being the crime and not the execution of the deed. *State v. Anderson*, 208 N.C. 771, 182 S.E. 643 (1935). "Direct proof of the charge is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933).

Evidence that after a long sea voyage the boat docked at night at an isolated point in Dare County and was almost immediately thereafter met by persons who arrived at the scene in two trucks, furnishes solid support for the inference that the meeting took place by prior agreement. Indeed, it seems almost inconceivable that such a meeting could have occurred without prior arrangement. The inference that the purpose of the meet-

ing was to unload marijuana from the boat into one or both of the trucks is equally solidly supported by the evidence. Finally, that defendant was one of the persons who joined in making the agreement may be reasonably inferred from the evidence that he had chartered and had participated in navigating the boat during the voyage in question. It was not necessary that the identity of defendant's coconspirators be disclosed, *State v. Gallimore*, 272 N.C. 528, 158 S.E. 2d 505 (1968), it being only necessary that the State show where the unlawful agreement was entered into, since "[o]ur courts have jurisdiction of a prosecution for criminal conspiracy, if any one of the conspirators commits within the State an overt act in furtherance of the common design, even though the unlawful conspiracy was entered into outside of the State. The rationale of this principle of law is that the conspiracy is held to be continued and renewed as to all its members wherever and whenever any member of the conspiracy acts in furtherance of the common design." *State v. Goldberg*, 261 N.C. 181, 203, 134 S.E. 2d 334, 349 (1964). We hold that defendant's motions challenging the sufficiency of the evidence were properly denied.

Defendant assigns error to the denial of his motion to suppress all evidence obtained as result of the warrantless search which the officers made on board the "Frances Ann." He contends that the search of the vessel violated his Fourth Amendment rights and that the exclusionary rules should be applied. We do not agree.

Following an extensive voir dire hearing at which the State presented evidence but the defendant elected not to do so, the trial court entered an order making findings of fact, including findings

that the boat "Frances Ann" had been tied up at a dock at Stumpy Point in Dare County from the 18th or 19th of May, 1977, until Sunday, May 22nd, 1977; that all of the windows in the deckhouse were open, and all doors that were visible were open, and no one was seen in or about the boat, and because of concern among some of the local people the Sheriff's office was notified and on Sunday afternoon, May 22nd, Deputy Sheriff Sammy Pledger arrived, and upon the

State v. LeDuc

representations having been made to him by Mr. Leland Wise, a resident of Stumpy Point, concerning the manner in which the boat was tied up and its unusual circumstances, above set out, Officer Pledger decided to board the boat to determine if anyone was aboard that was ill, or if any dead body was on the boat. In the instant case the officer was not engaged in a search for evidence to be used in a criminal prosecution ... [T]hat when [the officer] entered the deckhouse he saw in the captain's quarters an open cabinet directly below the captain's bunk which contained two bags, one within the other, and also contained vegetable material which he believed and which he had reason to believe was marijuana; that when he first entered the deckhouse it had a faint odor of marijuana, and upon entering the captain's quarters the odor was more pronounced.

That he also found on a table where food had been eaten, plates containing remains of stale food, a pipe made of tinfoil, which appeared to be homemade, and also green vegetable material on the table, these last items were found in the galley which adjoins the captain's quarters.

\* \* \* \* \*

The material that was found under the captain's bunk, and that which was found on the table in the galley, were in plain view of Officer Pledger ...

These factual findings, to which defendant has not excepted, are supported by evidence presented at the voir dire hearing. They fully support the conclusion that the initial boarding of the "Frances Ann" by Deputy Sheriff Pledger and the initial search which he then made of the vessel were constitutionally valid.

In *United States v. Miller*, 589 F. 2d 1117 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 59 L. Ed. 2d 771, 99 S. Ct. 1499 (1979), a yacht unknown to personnel at a marina and with no one aboard was discovered fouled in one of the marina's moorings. An employee of the marina called the Coast Guard, who in turn notified the county sheriff's office. Coast Guard officers and a deputy sheriff

boarded the yacht to investigate, in the course of their investigation finding a bill of sale and registration made out in defendant's name. On the following morning two deputies again boarded the boat, which bore the name the "COLD DUCK," to help the Coast Guard clear it from its fouled mooring lines and tow it to a marina slip. While on board they noticed marijuana debris and a navigational chart, which were in plain view. Based upon the course marked upon the chart, the officers were led to Mill Isle, a peninsula connected to the mainland by a causeway. There they found a large cache of marijuana. Prior to defendant's subsequent trial in the United States District Court on the charge of importing and possessing with intent to distribute more than 3000 pounds of marijuana, the District Court denied defendant's motion to suppress evidence of what the officers found on the boat and what they found by use of the navigational chart. *United States v. Miller,* 442 F. Supp. 742 (D. Maine 1977). In affirming defendant's conviction, the United States Court of Appeals, speaking of the first boarding which the officers made of the vessel, said:

> We have no difficulty approving the first boarding on the evening of May 13. At that point, a boat of unknown origin had been abandoned at a mooring belong[ing] to another person, where it remained for over twelve hours, fouled in its lines.

> A boat, like an automobile, carries with it a lesser expectation of privacy than a home or an office. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). A boat, even more than an automobile, becomes a matter of legitimate concern to public safety officials when it is found abandoned, 250 yards from shore, its dinghy still on board. The responsibility of state officials for the safety of property was triggered by these circumstances. See *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed. 2d 706 (1973) (state officials' "community caretaking functions" for vehicles involved in accidents). More important, the circumstances justified a reasonable fear of injury to life and limb, specifically a drowning. Such a combination of "community caretaking functions" and possibly

State v. LeDuc

exigent circumstances amply justified intruding upon the limited privacy expectations surrounding an abandoned vessel in order to determine ownership of the boat and the safety of its mariners. *Cf. Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed. 2d 486 (1978) (exigent circumstances allow warrantless intrusion to perform administrative function).

\*   \*   \*   \*   \*

To summarize, appellant's limited expectations of privacy in the COLD DUCK, already minimized by its abandonment at an unauthorized mooring, were not violated by entry pursuant to a reasonable belief that an emergency required an immediate search. The owner of the vessel had been missing long enough to trigger a reasonable belief of danger to life and limb and not so long as to make the proffered emergency a mere pretext.

589 F. 2d at 1125-1126.

[2] Although there are obvious differences in the factual situations presented in *United States v. Miller* and those presented in the present case, the decision in that case is persuasive authority for holding valid the initial boarding and search which Deputy Pledger made of the "Frances Ann." As already noted, the trial court found in the present case, in findings of fact which were supported by the evidence and to which no exception was taken, that in making his initial entry and search of the vessel the officer was not engaged in a search for evidence to be used in a criminal prosecution, but was engaged in determining if anyone was aboard who was ill or dead. Here, as in *Miller,* possibly exigent circumstances amply justified the officer's initial boarding of the vessel.

[3] The subsequent intensive search which the officers made of the "Frances Ann" after the boat was taken to the Coast Guard Station at Oregon Inlet presents a more serious question. From the information already obtained as result of Deputy Pledger's initial boarding of the vessel, the officers knew that it contained contraband. They also had reasonable grounds to believe that it

State v. LeDuc

had recently been used to transport much larger amounts of contraband and that a careful search would probably yield fingerprints or other evidence which would enable them to identify the persons who had used the vessel for that purpose. It must be conceded that the better course would have been for the officers to have submitted their information to an impartial magistrate and to have obtained a search warrant prior to embarking upon a further search of the vessel. Despite their failure to do so, however, we find their further search did not violate defendant's Fourth Amendment rights.

A defendant in a criminal case is constitutionally entitled to have evidence obtained as result of an illegal search excluded only if his own Fourth Amendment rights were violated by the search, *United States v. Salvucci,* _____ U.S. _____, _____ L.Ed. 2d _____, _____ S. Ct._____ (1980), and it has long been established that a person has no Fourth Amendment rights to property which he has abandoned. *Abel v. United States,* 362 U.S. 217, 4 L. Ed. 2d 668, 80 S. Ct. 683 (1960); *United States v. Canady,* 615 F. 2d 694 (5th Cir. 1980); *United States v. Williams,* 569 F. 2d 823 (5th Cir. 1978); *United States v. Colbert,* 474 F. 2d 174 (5th Cir. 1973); *Parman v. United States,* 399 F. 2d 559 (D.C. Cir.), *cert. denied,* 393 U.S. 858, 21 L. Ed. 2d 126, 89 S. Ct. 109 (1968); *Feguer v. United States,* 302 F. 2d 214 (8th Cir.), *cert. denied,* 371 U.S. 872, 9 L. Ed. 2d 1101, 83 S. Ct. 123 (1962). Earlier cases expressed this in terms of the defendant's lack of "standing" to object to the search of abandoned property. Following the decision in *Rakas v. Illinois,* 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978), analysis has shifted to focus upon whether a person retained any legitimate expectation of privacy in a place which he has abandoned or over property which he has discarded. Even prior to *Rakas,* some courts had adopted a similar analysis; for example, the opinion in *United States v. Colbert, supra,* decided in 1973, contains the following:

> The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain reasonable expectation of privacy with regard to it at the time of the search.

State v. LeDuc

474 F. 2d at 176.

Applying these principles to the facts disclosed by the record in the present case, it is apparent that defendant left the "Frances Ann" under circumstances in which he could have retained no legitimate expectation of privacy with regard to it. Under cover of darkness he left the vessel carelessly tied alongside a public dock which was itself adjacent to a public highway. He left it without spring lines to control its movement, demonstrating an indifference to its safety. He left it unattended, with all doors and windows of its deckhouse open, exposing its interior alike to the elements and to the curious gaze of all who might pass by. He left it without having obtained permission from the operators of the dock to do so and without notifying anyone in the small surrounding community in Dare County either of the identity of the vessel, of his own identity, or of his intention ever to return. And finally, he never did return to the dock where the boat was moored nor to Dare County until much later when he was apprehended in Florida by agents of the Federal Bureau of Investigation.[1] On these facts it is our opinion, and we so hold, that when defendant left the "Frances

---

[1]This last fact, of course, could not have been known to the officers at the time the search was made. Nevertheless, it was relevant to the question whether defendant had abandoned the "Frances Ann" and may properly be considered by the court in making that determination. This question was dealt with by Burger, Circuit Judge (now Chief Justice) in the opinion in *Parman v. United States*, 399 F. 2d 559 (1969) as follows:

   Appellant points out that to justify a search by a subsequent finding of abandonment where, at the time, the officers conducting the search have no reason to believe that abandonment has occurred, places serious limitations on the deterrence rationale of the fourth amendment. This "intriguing" argument has been rejected elsewhere. *See* Judge [now Justice] Blackmun's careful analysis in *Feguer v. United States*, 302 F. 2d 214, 248-250 (8th Cir.), *cert. denied*, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed. 2d 110 (1962). We think this limitation on the deterrent effect of the exclusionary rule is implicit in the rule that a third party cannot object to illegally seized evidence. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). No recent Supreme Court decision hints any curtailing of this rule, and we see no reason for treating a person who abandons property before the search any differently from a third party.

399 F. 2d at 565.

Ann" at the Stumpy Point dock, he abandoned it and could not thereafter have had any legitimate expectation of privacy with reference to it or its contents.[2] Accordingly, we hold that none of defendant's Fourth Amendment rights were violated by the intensive search which the officers made of the vessel and its contents and the evidence obtained as a result of that search was properly admitted at defendant's trial.

[4] Defendant assigns error to the admission in evidence of the charter agreement entered into between the owners of the "Frances Ann" and the person who identified himself to the owners as "Milan A. LeDuc." Neither of the owners could identify the defendant at trial as the person who had chartered the boat from them. *Citing State v. Fulcher,* 294 N.C. 503, 243 S.E. 2d 338 (1978), *State v. Austin,* 285 N.C. 364, 204 S.E. 2d 675 (1974), and *State v. Vestal, supra,* defendant contends that admission in evidence of the charter agreement bearing his name without competent evidence that he was the person who signed it constituted reversible error. We are constrained to agree. The above cited cases hold that the mere fact that a person's name appears on a document constitutes no proof that the signature is his or that he authorized it, and it is error to admit such a document in evidence in a criminal trial over the defendant's objection absent competent evidence that the signature on the document is his. In the present case the State sought to prove that the signature on the charter boat agreement was the defendant's by exhibiting the agreement together with admittedly genuine samples of defendant's signature to the jury for their comparison. Although this method of proving a disputed handwriting is approved by courts in a number of jurisdictions, including some which have statutes similar to our own, *see*

---

[2]We recognize that the trial court made no express finding of abandonment. It is, of course, preferable that this be done. Although that issue was not focused upon by the trial court, we find our own conclusion that abandonment occurred supported by certain of the trial court's specific factual findings and by uncontradicted evidence in the record. *See United States v. Edwards,* 602 F. 2d 458, 469 (1st Cir. 1979) (relying on specific factual findings made by the trial court to support its own conclusion that exigent circumstances existed); *United States v. Miller,* 589 F. 2d 1117, 1127 (1st Cir. 1978) (relying "on the record and the few facts found" to address legal argument on a suppression issue which was not emphasized before the trial court.)

Annot., 80 A.L.R. 2d 272 (1961), it has not been approved in this State. Our statute, G.S. 8-40, provides as follows:

> *Proof of handwriting by comparison.* — In all trials in this State, when it may otherwise be competent and relevant to compare handwritings, a comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute.

After analyzing the change effected in our former practice by the enactment of this statute, Brock, J. (now Justice), speaking for this Court in *State v. Simmons,* 8 N.C. App. 561, 563, 174 S.E. 2d 627, 629 (1970), said: "However, neither G.S. 8-40, nor our rules of evidence, permits the jury, unaided by competent opinion testimony, to compare writings to determine genuineness." It was error for the court in the present case to permit the jury to do so in the face of defendant's timely objections. The charter agreement was an important part of the State's case, since it provided powerful linkage connecting defendant with the voyage of the "Frances Ann." Even though there was other evidence to show defendant's presence on the boat, we cannot say that the error in the admission of the charter agreement was harmless beyond a reasonable doubt. For that error, defendant is entitled to a new trial.

Prior to trial defendant moved to compel the State to permit defendant to inspect certain items, such as the coffee cup and radio, which were on the "Frances Ann" and from which latent fingerprints of the defendant were lifted. The State responded to this motion by showing to the court that these items were no longer in its possession since they had been left on the vessel when it was returned to its owners. The motion was denied, as was defendant's subsequent motion made pursuant to G.S. 15A-974 to suppress these items and all evidence derived from them. We find no error in these rulings. The items themselves were never admitted into evidence, and defendant has failed to show any way in which he was prejudiced by not having been given an opportunity to inspect them.

[5]   We also find no error in the court's overruling defendant's objections to the testimony of Alvin Johnson, a former Coast Guard officer, concerning the significance of certain charts and navigational notations found aboard the "Frances Ann." The witness was properly qualified and accepted by the court as an expert in navigation on the high seas, and to this the defendant takes no exception. The witness's testimony related to matters within his field of expertise. There was no error in its admission.

Certain of defendant's remaining assignments of error relate to protions of the court's instructions to the jury or to other incidents occurring at the trial. Since the questions raised are not likely to arise upon another trial, we refrain from discussing them.

For the reason above noted, defendant is awarded a new trial.

New Trial.

Judge WEBB concurs.

Judge ARNOLD dissents.

Judge ARNOLD dissenting.

I dissent. While I believe the majority decision correctly interprets the holding of this court in *State v. Simmons, supra,* I believe *Simmons* is wrongly decided. The plain language of G.S. §8-40 does allow the jury to compare writings for genuineness, and I find nothing else in our rules of evidence to require that the jury must be aided by expert testimony. Other jurisdictions, and apparently a majority, permit the trier of facts to make handwriting comparisons without the aid of experts. Moreover, I find the reasoning of the Minnesota Supreme Court in *State v. Houston,* 153 N.W. 2d 267, 269 (1967), to be sound:

>      Whatever may have been the experience and competence of common-law jurors to assess the genuineness of signatures, we are of the opinion that this aptitude is one which today most laymen have been obliged to develop in

conducting their own affairs. With the widespread use of credit cards and travelers' checks, merchants and others in the field of commerce are frequently confronted with the necessity of comparing signatures. In the light of this common experience and exposure, we hold that a factfinder may, in the discretion of the court, be permitted to resolve the issue of forgery without expert assistance. Under our law it is not incumbent on jurors to accept an expert's opinion blindly. They must come to their conclusion on the basis of their own observations and experience and assessment of all the evidence before them. *Backman v. Fitch*, 272 Minn. 143, 155, 137 N.W. 2d 574, 582.

Therefore, I vote to find no error.